# EXHIBIT A

**EXHIBIT A**



# AWARD

**CHAMBRE DE COMMERCE INTERNATIONALE — INTERNATIONAL CHAMBER OF COMMERCE (ICC)**
**COUR INTERNATIONALE D'ARBITRAGE — INTERNATIONAL COURT OF ARBITRATION**

www.iccarbitration.org

HEADQUARTERS
33-43 avenue
du Président Wilson
75116 Paris, France
**T** +33 (0)1 49 53 28 28
**F** +33 (0)1 86 26 67 43
**E** arb@iccwbo.org

ASIA OFFICE (HKSAR)
Room 102, 1/F., West Wing,
Justice Place, 11 Ice House
Street, Central, Hong Kong
**T** +852 3607 5600
**F** +852 2523 1619
**E** ica8@iccwbo.org

NORTH AMERICA OFFICE
in affiliation with SICANA, Inc.
140 East 45th Street, Suite 14C
New York, NY 10017, USA
**T** +1 646 699 5704
**F** +1 646 737 9467
**E** ica9@iccwbo.org

BRAZIL OFFICE
in affiliation with SCIAB LTDA.
rua Surubim, 504, Brooklin Novo
CEP 04571-050, Sao Paulo
Brazil
**T** +55 11 3040 8830
**E** ica10@iccwbo.org

SINGAPORE OFFICE
in affiliation with SICAS
28 Maxwell Road #02-01,
Maxwell Chambers Suites,
Singapore 069120
**T** +65 6971 1000
**E** ica11@iccwbo.org

**EXHIBIT A**

## ICC INTERNATIONAL COURT OF ARBITRATION

### CASE No. 23464/MK/PDP

TRIVIDIA HEALTH, INC.

(U.S.A.)

**vs/**

NIPRO CORPORATION

(Japan)

This document is an original of the final award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

**EXHIBIT A**

**INTERNATIONAL CHAMBER OF COMMERCE**
**INTERNATIONAL COURT OF ARBITRATION**


Case No. 23464/MK/PDP


**TRIVIDIA HEALTH, INC. (U.S.A.)**

<u>Claimant</u>

-and-

**NIPRO CORPORATION (Japan)**

<u>Respondent</u>


Collectively "the Parties"


**<u>Final Award</u>**


<u>The Tribunal</u>

Mr. James W. Quinn (Co-arbitrator)
Dr. Tai-Heng Cheng (Co-arbitrator)
Mr. Klaus Reichert (President)

**CONTENTS**

A.      Introduction & Procedural History (pp. 2-17)

B.      The Partial Final Award (p. 18)

C.      Factual Context (pp. 19-32)

D.      Claims made by the Parties (pp. 32-37)

E.      Discussion & Analysis (pp. 37-75)

           Introduction – Arrangement of Issues (pp. 37-40)

           Should the Agreement be adjusted in some way? (pp. 40-55)

           Did the Parties engage in good faith efforts (as a matter of clause 2.2 of the Agreement) to mutually agree on the Annual Minimum Purchase for Contract Year 3? (pp. 56-62)

           Was the termination of the Agreement asserted by the Claimant in March 2019 was legally sound? Consequences? (pp. 63-73)

           Claims regarding the Claimant's Proprietary Information and Marks (pp. 73-75)

F.      Interest (pp. 75-76)

G.      Costs (pp. 76-79)

H.      General (p. 79)

I.      Final Award (pp. 80-81)

**EXHIBIT A**

## A.     Introduction & Procedural History

1.     This Final Award brings this arbitration to a close and definitively decides the claims as finally articulated by the Parties against each other.

2.     Words and phrases defined in:

(a) the Terms of Reference dated June 27, 2018; and

(b) the Partial Final Award dated October 16, 2018 (and notified to the Parties on October 29, 2018),

are adopted herein. The matters decided by the Partial Final Award are set out in detail below (paras 4-5 and 42). Further, the identification of the Parties, their representatives[1], the members of the Tribunal, the text of Arbitration and Choice of Law Agreements, the indication of the applicable ICC Rules, and the procedural histories, all recorded in, first, the Terms of Reference and, secondly, the Partial Final Award are noted and not repeated herein. For the avoidance of doubt, each of the foregoing matters are incorporated herein by reference.

3.     The following steps have taken place since the Partial Final Award (this is not intended to be a comprehensive account of everything which has happened, but rather encapsulates that which is essential in the Tribunal's estimation):

---

[1] The Tribunal was informed by letter dated April 30, 2019, that Respondent's Counsel changed insofar as Baker & McKenzie were replaced by: Neil A.F. Popović, Sheppard Mullin Richter & Hampton LLP, Four Embarcadero Center, 17th Floor, San Francisco, CA 94111, telephone: (415) 774-3156, email: npopovic@sheppardmullin.com; Edward H. Tillinghast, III, Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, New York, NY 10112, telephone: (212) 634-3092, email: etillinghast@sheppardmullin.com; Rena Andoh, Sheppard Mullin Richter & Hampton LLP, 30 Rockefeller Plaza, New York, NY 10112, telephone: (212) 634-3050, email: randoh@sheppardmullin.com

(a)   Following consultation with the Parties (in writing and by means of a telephone conference) the Tribunal issued the Procedural Order of October 17, 2018 ("PO 10/17"). In particular, PO 10/17 directed the following:

> *The Tribunal, therefore, directs the Respondent to resubmit its Memorial by Friday, November 2, 2018 (being three weeks after its letter), in which it will set out in full its case underpinning the new reliefs. The new Memorial should not restate or repeat the case on interpretation which was disposed of by the Partial Final Award. Finally, the new Memorial should retain the Respondent's case on its claim relating to the negotiations leading to Year 3 (as recorded above) as that is a ripe matter as between the Parties and, as the Tribunal understands the position, fully briefed based on the materials available to each side at this time.*
>
> *In short, the resubmitted Memorial will describe the Respondent's live claims in this arbitration in full. The Respondent will also have seen, in outline, points made by the Claimant in correspondence. Insofar as is possible at this stage, the Respondent is invited to consider these points and set forth its position in the resubmitted Memorial. Depending on how these points are ultimately developed in due course by the Claimant, the Respondent would, as a matter of course, be afforded the opportunity to respond, but as these matters are now already flagged up in more than just cursory detail, it appears to the Tribunal that the Respondent should at least address them in as much detail as it is able at this time.*
>
> *The next step thereafter would be for the Claimant to plead its Memorial in full as against the Claimant's* [sic, the correct word should have been 'Respondent' but no point was taken at that time] *resubmitted Memorial. The Claimant, in its letter of October 16, 2018, suggests a time period of 30 days in order to answer what would, in its view, be effectively new counterclaims. This, it says, mirrors the 30 day time period for an Answer in the ICC Rules at the outset of a case. The Tribunal does not consider this to be the appropriate time limit in the present circumstances, rather, the Claimant is directed to file its Memorial setting out its case in full in all respects in relation to all live claims (both made by it, and made against it) in this arbitration by November 28, 2018.*

(b)   The Respondent resubmitted its Memorial on November 2, 2018.

(c)   The Claimant submitted its Memorial on November 28, 2018.

**EXHIBIT A**

(d)     The Tribunal issued the Procedural Order of November 29, 2018 ("PO 11/29") which

directed the following:

> Thus, the Parties are to each prepare a list of specific issues, in descending order of importance, by reference to the Submissions so far in the case. Each specific issue must identify whether it involves (a) solely matters of law, or (b) mixed questions of fact and law, or (c) solely a questions of fact. In respect of each issue which a party says involves a factual matter, it should be clearly stated as to whether, on the present state of the Submissions, such facts (which must be key anterior facts, not simply peripheral facts) are disputed; and, secondly, if they are disputed, what essential evidential steps are actually necessary in order for the Tribunal to resolve such factual dispute. By "actually necessary" the Tribunal wishes the Parties to clearly understand that it means a high degree of precision as to what forensic steps must be taken rather than something more diffuse. "Fishing expeditions", trails of enquiry, or diffuse investigations into peripheral facts are not going to be of assistance, and therefore not persuasive.
>
> Each party's list of specific issues, in the manner set out in the foregoing paragraph, should be submitted to the Tribunal by no later than 5pm NY time on Friday, December 7, 2018.
>
> Each party should, by no later than 5pm NY time on Friday, December 7, 2018, submit its document production requests to the other (as envisaged by section F of the Procedural Order of June 27, 2018), and copy the Tribunal with those requests. The Tribunal expects that the document production requests would carefully tie in with the specific issues and essential evidential steps identified as actually necessary.
>
> At a mutually convenient time during the course of the week of December 10, 2018, the Tribunal will convene a telephone conference call with the Parties at which time each side would: (a) make oral submissions on the list of specific issues prepared by their opponent; (b) make oral submissions on the document production requests propounded by their opponent; (c) make oral submissions on the next steps to be taken in the case in light of the lists of issues suggested by each side.

(e)     On December 7, 2018, the Parties submitted their respective lists of issues in

accordance with PO 11/29. Further, at that time the Respondent submitted a list of

document production requests, whereas the Claimant did not do so.

(f)    On December 14, 2018, the Tribunal and the Parties held a conference call and arising from that was the Procedural Order of December 18, 2018 ("PO 12/18") which provided, in part, as follows[2]:

> *Turning now to a consideration of the issues which flow from the foregoing, and taking into account the issues which the Parties have each suggested in writing together with their oral comments during the telephone conference on December 14, 2018; it appears to the Tribunal that the following matters for resolution logically arise:*
>
> *A. For the purposes of either misrepresentation and/or mistake at the time of the execution of the Agreement, which are the relevant entities vis a vis the Respondent?*
>
> *B. Why did the Respondent not see or appreciate that the Agreement, which it was about to execute, did not comport with the belief it had about years 3, 4, and 5? Is the reason given (namely, the contents of the email its then negotiator and servant, Mr Verner sent to it) legally sufficient as a matter of New York law to permit it not to be bound to the terms of the Agreement?*
>
> *C. In light of the resolution of issue 1, does Mr Verner's email constitute, as a matter of New York law, a misrepresentation? In what way, specifically? If it is a misrepresentation as a matter of New York law, then who, at the time it was made, is responsible for it?*
>
> *D. What, precisely, is the mistake alleged by the Respondent? Is it one of material fact (and why), or one of legal consequence (and why)? In the case of mutual mistake as at the moment of execution of the Agreement, (in light of the resolution of issue 1) who were the "parties" to such mutual mistake and how is this manifested?*
>
> *E. Are there matters which would preclude the Respondent's claims: (a) clause 16.2 of the Agreement; or (b) timely raising of the claims for rescission and/or reformation.*
>
> *F. What was the extent of Mr Verner's fiduciary duty to the Respondent, was it breached by any of his actions up to the execution of the Agreement, and if so, are there consequences for the performance of the Agreement now?*
>
> *G. Did the Parties use good faith efforts to mutually agree on the Annual Minimum Purchase for Contract Year 3 prior to the end of Contract Year 2?*

---

[2] PO 12/18 also set out a timetable for document production matters, further submissions, and the dates of a hearing in March 2019.

(g)     By Procedural Order of December 28, 2018 ("PO 12/28") the Tribunal ruled on the Respondent's document production requests.

(h)     The Tribunal made a further ruling by email dated February 10, 2019, in respect of document production.

(i)     On February 15, 2019, the Respondent filed its reply submission.

(j)     On March 1, 2019, the Claimant filed is rejoinder submission.

(k)     On March 11, 2019, the Respondent stated in the following by letter, is recorded in full:

> *We write to inform you that on Friday, March 8, 2019, Trividia terminated the parties' International Distribution Agreement effective immediately. Given such a significant development on the eve of hearing, Nipro cannot possibly evaluate the full impact on the issues presently before this Tribunal. Nipro will not proceed under these circumstances. In light of this termination, Nipro hereby withdraws its defensive claims under this arbitration without prejudice. Further, with the remainder of the Agreement terminated, Nipro is now willing and has informed Trividia that it agrees that the Contract Year 3 Annual Minimum Purchase quantity shall be the same as Contract Year 2 (see attached). Based on its withdrawal of its defensive claims and resolution of the Contract Year 3 Annual Minimum Purchase quantity, the only remaining claims in the pending arbitration are the parties' claims for attorneys' fees and costs. Accordingly, the evidentiary hearing is no longer necessary.*

> *We await the Tribunal's instructions as to the parties' mutual costs submissions and are available for a call as needed. We regret the timing of this development, but Trividia only notified us of the termination this past Friday while our client and witnesses were en route to New York.*

(l)     Following the Tribunal's invitation to comment, the Claimant set out its position in reply to the Respondent's letter of March 11, 2019 (and did so by email of that date):

> *This responds to your email of this evening requesting additional detail concerning the events that have transpired since Friday and Trividia's position with respect to Nipro's communication earlier today that it was agreeing to the Year 3 Minimum Purchase Amount and withdrawing its defense claims.*

*Last Friday, Trividia was compelled by Nipro's conduct, to inform Nipro that it was terminating the IDA as a result of Nipro's numerous breaches, including failing to meet the Year 3 Minimum Purchase Amount and its misuse and infringement of Trividia's trademarks.*

*The breach concerning Year 3 only matured on January 6, 2019, when Year 3 ended with Nipro failing to meet its Minimum Purchase Requirement for that year. The breaches for misuse and infringement of Trividia's trademarks became known to Trividia in late 2018. The notice of termination was preceded by a notice Trividia provided Nipro on January 16, 2019 advising it of the breaches of the IDA and providing Nipro 30 days to cure them. Trividia also provided notice of Nipro's breach for failure to provide forecasts as required under the IDA for Contract Year 4. It was when Nipro failed to cure these breaches that Trividia terminated the IDA. For example, as of Friday, Nipro was still actively misusing Trividia's trademark. The termination of the IDA does not in any way impair the parties' ability to arbitrate their current claims or the Tribunal's jurisdiction to adjudicate them, this Wednesday and Thursday. The only claim Trividia currently asserts is Nipro's failure to negotiate in good faith the Minimum Purchase Amount for Year 3. Because Nipro has now agreed that the Purchase Amount for Year 3 is the same as it was for Year 2, this claim by Trividia is resolved by consent. Trividia expects that the Tribunal will issue an award finding that the Minimum Purchase Amount for Year 3 is 3.6 million fifty-count vials of strips (totaling 180 million strips).*

*Because Nipro has failed to meet that Minimum Purchase Amount, Trividia will pursue a claim for damages. In addition, because Nipro's breaches caused the termination of the IDA, Trividia will also pursue a claim for damages related to Contract Years 4 and 5. Moreover, because Nipro has misused and infringed Trividia's trademarks, Trividia will also seek relief with respect to that breach of the IDA, which entitles Trividia to terminate and bring a claim for damages to ensure it receives the benefit of its bargain including damages for Years 3-5. Trividia intends to request permission to assert these breach claims in this proceeding, to be raised and addressed as to be scheduled by this Tribunal after Wednesday's hearing.*

*In our view, Nipro's withdrawal of its claims to rescind or reform the IDA and its agreement as to the Minimum Purchase Amount for Year 3—along with the undisputed fact that Nipro has not met its obligation to purchase the Minimum Purchase Amount for Year 3—leaves to be arbitrated only the question of Trividia's damages as a result of Nipro's breaches, and the issue of attorney's fees and cost. We stand ready, with the permission of the Tribunal, to assert a claim for those breaches and damages. Once the claim is filed, we anticipate*

*that the Tribunal will hold the appropriate proceedings to adjudicate the amount of the damages award to Trividia.*

*It is further Trividia's position that Nipro should not be able to assert its claims for reformation and rescission in the breach and damages proceedings. Nipro had plenty of opportunity to pursue those claims and present them to the Tribunal on Wednesday. It should not be able to at the last minute, apparently in recognition of the weakness of the claims, withdraw them "without prejudice," only to re-assert them in the future. After requiring Trividia to spend considerable resources to defend against those claims, Nipro should be directed to present its claims now or forego doing so in the future.*

*In sum, Nipro's agreement as to the Year 3 Minimum Purchase Amount and withdrawal of its defensive claims leaves only the issues of breach and resulting damages, which should require a fairly streamlined proceeding given Nipro's admitted failure to meet is contractual obligations.*

(m)   By email of March 11, 2019, the Tribunal ruled that the hearing as scheduled would not now take place.

(n)   Following a conference call held with the Parties on March 14, 2019 (at which time the Claimant sought permission to bring new claims, which was then followed by written exchanges between the Parties on that subject), the Tribunal (by email of April 9, 2019) permitted the Claimant to bring new claims which fell outside the limits of the Terms of Reference. The relevant text of the Tribunal's email which permitted the Claimant to bring new claims was as follows:

"The Tribunal has deliberated on the application of the Claimant to bring the following claims in this arbitration: *1. Grant Claimant's claim that Respondent breached the IDA by failing to make the Annual Minimum Purchase for Contract Year Three thereby resulting in termination of the IDA and award expectancy damages under New York law for Contract Years Three through Five. See IDA Sections 1.1; 2.1; 2.2; 3.2; Article V; Schedule A; Schedule C; Schedule D. i. Respondent conceded that the Annual Minimum for Contract Year Three should be the same as Contract Year Two. The Contract Year Two Annual Minimum was 3,600,000 fifty (50) count vials of strips (180,000,000 strips) equalling $18,900,000 in purchases. As a result of Respondent's breach and resulting termination of the IDA, the Contract Year Two Annual Minimum also applies for Contract Years Four and Five. Respondent failed to purchase 2,213,308 50 ct. equivalent test strip*

*vials of product for Contract Year Three. As of the date of this filing, Respondent has represented that it will submit POs for this remaining purchases for Contract Year Three by April 1, 2019. If Respondent fails to purchase the remaining product as presently agreed, Claimant reserves its right to supplement its damage claim. ii. Prior to termination, Respondent had certain POs outstanding. Accordingly, the expectancy damages for (1) Contract Year Four is $8,355,441; (2) the expectancy damages for Contract Year Five is $11,700,000; (3) the related equipment and inventory damages which relate to Contract Years 4 and 5 are $4,450,000 (4) lost interest on cash receipts $98,769 for a total expectancy damages under New York law of at least $24,604,210.00. 2. Grant Claimant's claim for breach of the IDA for Respondent's misuse of Claimant's trademarks in violation of the parties' agreement and award related damages. See Sections 3.10; 3.6; 3.1 and Schedule F. Claimant has only recently learned of Respondent's trademark infringement and is presently attempting to assess the full extent of the damage to Claimant's international customer base and internationally recognized brand and therefore, an exact monetary amount cannot presently be stated but Claimant estimates the damages will not be less than $23,239,734 which may be subject to treble damages. As a result of Respondent's breach of the IDA by misusing Claimant's trademarks, Claimant was forced to terminate the IDA. Accordingly, it is also entitled to expectancy damages for the Annual Minimum Purchase Amounts for Contract Years Four and Five as stated above. 3. Grant Claimant's claim for injunctive relief based on Respondent's misuse of Claimant's trademarks. 4. Grant Claimant's claim for breach of the IDA by failing to provide requested forecasts for Contract Year Four and award related damages. As a result of Respondent's breach of the IDA, Claimant was forced to terminate the IDA. Accordingly, it is entitled to expectancy damages for the Annual Minimum Purchase Amounts for Contract Years Four and Five as stated above. 5. Deny Respondent's reformation and rescission defenses with prejudice as a result of their withdrawal of those defenses on the eve of the scheduled hearing. 6. Grant Claimant prevailing party attorney's fees, costs and expenses associated with this matter as provided for in XIV of the IDA in an amount to be fixed at the completion of the proceeding. 7. Grant pre-judgment interest pursuant to New York law. 8. Grant such other relief to Claimant as the Tribunal may conclude is just and proper.* The Tribunal has, further, considered the Respondent's opposition to the application, and notes that it prefers to have the arbitration brought to a close with the question of costs being the remaining matter to be decided. The Tribunal also notes the Respondent's purchase order for Contract Year 3. The Tribunal has decided to permit the Claimant to make the claims which fall outside the limits of the Terms of Reference. In doing so the Tribunal has

considered a number of factors which appear to it to be material to its decision:1. It appears clear that if this arbitration is brought to an end now, the Claimant will file a further arbitration and the Respondent will assert again its position on reformation/rescission. There is a debate between the parties (as the Claimant asserts in its prayer for relief no. 5 recorded just above) as to the consequences of their withdrawal without prejudice by the Respondent. The Tribunal expresses no view, nor should any be inferred, as to what the consequences might be either for this arbitration, or a hypothetical second arbitration. The key point is that the Tribunal appreciates that the Respondent's claims for reformation/rescission would be in play, and the work which has been done in this arbitration to date would require being repeated. 2. The Claimant was quite clear, all along, in not seeking damages in this arbitration. However, the matters before the Tribunal were not clearly delineated from the monetary consequences for Contract Year 3. The Claimant sought relief as to whether the parties had negotiated in good faith for the purposes of the amount for Contract Year 3 (which would, in the Tribunal's appreciation, appear to be a predicate in the Claimant's mind for the Contract Year 3 amount). Similarly, the Respondent sought relief of a related, but markedly different variety that there had not been good faith negotiations, and either wanted the Tribunal to send the parties back to negotiations, or set a different amount. The Tribunal quotes from the Respondent's prayers for relief as of February 15, 2019 (emphasis added to indicate a relief which had not previously been sought): *iii. A declaration that Claimant has failed to negotiate the Contract Year 3 Annual Minimum Purchase quantity in good faith, and to set that quantity at a commercially reasonable level that takes into account the market realities of a product priced significantly above that of its competitors **or require Trividia to go back and negotiate Year 3 in good faith***. The Tribunal notes that the Claimant's filing of March 1, 2019, did not take issue with this additional relief. Thus, in a roughly similar way, the Respondent was intent on having the Tribunal direct consequences, which would have led to monetary consequences, for Contract Year 3.  4. It is undoubtedly the case that the termination by the Claimant is a new matter, and its grounds (as set out in outline at prayers for relief nos. 2 and 4 recorded above) for termination are to be precisely set out and tested in due course. Whether they are established, and whether they have consequence in expectation damages which the Claimant asserts they do, remains to be seen. How these matters interact with what the Respondent has described as its affirmative defences (and the Tribunal also notes that there is a dispute between the parties as to their pendency in this arbitration) also remains to be seen. In summary, in the exercise of its discretion in this matter, the Tribunal takes an overall balance as to what would be more cost-effective and expeditious in bringing this matter to an end. On the one hand, if this arbitration

ends now, and there is a second arbitration, there is a significant risk of redoing the work done to date; on the other hand, while there would be new matters in play, how they interact with the extant work done to date in this arbitration is something which the Tribunal is best placed to assess.

Additionally at that time the Tribunal directed the following procedural steps:

1. *The Claimant is to plead a new Statement of Claim/Memorial, with <u>all</u> claims and matters thoroughly and completely articulated. Insofar as matters which have already been pleaded are to be utilised, these are to be repeated but should not, for the purposes of efficiency, evolve further as the Tribunal does not see it as appropriate that issues which have been argued in full to date be changed or finessed in a way which would trigger further document production. Of course, how such matters might, or might not interact with the new aspects of the case, is a different point. Further, there is no need to refile evidentiary exhibits, or witness statements, but what we do require is that it is made clear which exhibits are not being relied upon (and which are no longer being relief upon), mutatis mutandis with witnesses, and also any new evidence to be clearly attached.*

2. *The Respondent is to plead a new Statement of Defence/Memorial, and adopt a similar approach as to that directed for the Claimant just above.*

3. *The parties should then exchange any document production requests on matters which are <u>new</u>. Under no circumstances should the parties seek documents on matters which were in play before the Tribunal adjourned the March hearing. The Tribunal can resolve any disputes on such requests. As before, the Tribunal expects a very high degree of precision on production requests.*

4. *The Claimant is to plead a Statement of Reply.*

5. *The Respondent is to plead a Statement of Rejoinder.*

6. *We have a hearing at the earliest opportunity.*

(o)  By email of May 9, 2019, the Claimant informed the Tribunal that the Parties had agreed the following:

*The parties have conferred and have agreed to the following schedule.*

*1. "The Claimant is to plead a new Statement of Claim/Memorial, with all claims and matters thoroughly and completely articulated. Insofar as matters which have already been pleaded are to be utilised, these are to be repeated but should not, for the purposes of efficiency, evolve further as the Tribunal does not see it as appropriate that issues which have been argued in full to date be changed or finessed in a way which would trigger further document production. Of course, how such matters might, or might not interact with the new aspects of the case, is a different point. Further, there is no need to refile evidentiary exhibits, or witness statements, but what we do require is that it is made clear which exhibits are not being relied upon (and which are no longer being relief upon), mutatis mutandis with witnesses, and also any new evidence to be clearly attached."*

**Due Date:  Friday May 31ˢᵗ**

*2. "The Respondent is to plead a new Statement of Defence/Memorial, and adopt a similar approach as to that directed for the Claimant just above."*

**Due Date: July 31st**

*3. "The parties should then exchange any document production requests on matters which are new. Under no circumstances should the parties seek documents on matters which were in play before the Tribunal adjourned the March hearing. The Tribunal can resolve any disputes on such requests. As before, the Tribunal expects a very high degree of precision on production requests."*

**Due Date: August 9ᵗʰ  (doc requests exchanged)**

**Due Date: August 19 (response to doc requests exchanged)**

**Due Date:  August 26th  (disputes heard about doc requests if any)**

**Due Date:  September 13th (doc production)**

*4. "The Claimant is to plead a Statement of Reply."*

**Due Date:  October 25th**

5. *"The Respondent is to plead a Statement of Rejoinder."*

**Due Date:  November 22nd**

6. *"We have a hearing at the earliest opportunity."*

**Due Date:  Week of December 16th**

(p)     On May 31, 2019, the Claimant filed its Memorial in accordance with the agreed schedule (for the avoidance of doubt "agreed schedule" means the dates set out in sub-paragraph (o) just above).

(q)     On July 15, 2019, the Tribunal ruled, by email, on the Respondent's application (made on July 12, 2019, followed then by written exchanges) to exclude certain claims advanced by the Claimant in its Memorial of May 31, 2019:

> *The Respondent's application to exclude, from the ambit of this arbitration, parts of the Statement of Claim dated May 31, 2019, is denied.*
>
> *On April 9, 2019, the Tribunal permitted the Claimant to bring, in this arbitration, certain claims which fell outside the limits of the Terms of Reference. Those claims are reflected in the Statement of Claim in the prayers for relief. Those prayers for relief are the claims which the Tribunal will, following the closing of the case in due course, either grant or refuse. The "counts" (a term which the Tribunal knows is more closely associated with municipal court pleadings in the United States) in the Statement of Claim are not the claims, but when read substantively, rather than attaching significance to the label or description, are in fact the legal reasoning underpinning the claims. The Claimant correctly points out that the occasion for the legal analysis is the memorial and it did not have to identify every such legal standard in advance to the Respondent when seeking permission to bring claims falling outside the limits of the Terms of Reference.*

(r)     On August 1, 2019, the Respondent filed is Statement of Defense/Memorial.

(s)     Following the Parties' exchanges of document production requests and consequential replies, the Tribunal ruled by email on August 29, 2019, on the remaining (by then) disputed categories.

(t)     On November 1, 2019, the Claimant filed its Statement of Reply (the agreed schedule having been adjusted by the Parties).

(u)     On November 23, 2019, the Respondent filed its Statement of Rejoinder.

(v)     The hearing commenced on December 16, 2019, in New York and proceeded as follows:

   a.   <u>Day 1</u>: following introductions[3], the oral opening statements of the Claimant and the Respondent took place; there then followed testimony by Dean Sorrentino and Vanessa Perez Lopez (both on behalf of the Claimant);

   b.   <u>Day 2</u>: the testimony of Vanessa Perez Lopez continued, followed then by testimony from Scott Verner, Jiangfeng Fei and Lauren Kindler (all on behalf of the Claimant);

   c.   <u>Day 3</u>: the testimony of Kazuo Wakatsuki, Tomohiro Somekawa, Kimihito Minoura and Noriyoshi Iwasaki (all on behalf of the Respondent);

   d.   <u>Day 4</u>: the testimony of Noriyoshi Iwasaki continued, followed then by testimony from Tom Rosseel, Michael McMaugh and James Donohue (all on behalf of the Respondent);

   e.   <u>Day 5</u>: the hearing concluded with the continuation of the testimony of James Donohue.

(w)     By email dated January 2, 2020, the Tribunal communicated the following questions to the Parties for the purposes of their post-hearing briefing:

---

[3] The Tribunal records the following exchange at the outset of the hearing: *ARBITRATOR REICHERT: A couple of things before we move to the openings. Just so that we are clear and it's on the record. That the steps that were planned leading up to today have all been completed so you recollect we at various times throughout the course of the case established timetables. I want to make sure everything that was to be done has been done, that there is nothing left trailing behind us, can you make that confirmation. MS. McCAWLEY: That is correct. MR. TILLINGHAST: Yes that's correct.*

*Having considered the submissions and the course of the oral testimony, the Tribunal invites the parties to file written post-hearing briefs in answer to the following questions, which should be by reference to the existing record:*

*Q.1: What exactly is meant, by reference to New York law, by the phrase "the parties shall use good faith efforts to mutually agree" in clause 2.2 of the IDA? The Tribunal requests the parties to exercise a high degree of discrimination when it comes to citation so that we are only directed to cases (either on the record, or if absolutely necessary, not yet on the record) which are of direct assistance and not simply illustrative of what other contractual language in other contexts might have said.*

*Q.2: By specific reference to the evidence on the record of this case, what were, or were not, the "good faith efforts to mutually agree" on the part of the Claimant leading up to the commencement of Contract Year 3, and were those efforts undertaken in good faith, or not, by reference to the answer given to Q.1.*

*Q.3: What is the precise legal standard for the doctrine of unilateral mistake under New York law? The same admonition applies here as with question 1.*

*Q.4: By specific reference to the evidence on the record of this case and by reference to the answer given to Q.3, was the Respondent mistaken as to the effect of clause 2.2 of and Schedule C to the IDA, and does clause 12 have any consequence? If the Respondent was so mistaken, according to the standard required under New York law, what is the consequence?*

*Q.5: By reference to the matters of complaint itemised in C-65 and by specific reference to the evidence on the record of this case: (a) do the matters each come within "any breach of this Agreement" as per clause 2.4(iii) of the IDA; and (b) were each cured by the Respondent within 30 days to the extent required so as to preclude the right of the Claimant to terminate as per the introductory language of clause 2.4 of the IDA.*

*Q.6: As regards the Claimant's claim for expectancy damages for Contract Years 3, 4 and 5: (a) what is the precise status of Contract Year 3 purchases; (b) assuming, without finding, that the final sentence of Schedule C to the IDA continues to apply in respect of expectancy damages for Contract Years 4 and 5, what, if any, deductions are to be made.*

*Q.7: As regards the Claimant's claim for relief of pre-judgment interest, assuming without finding that its claim for expectancy damages succeeds, from what date should interest run until the date of the award? What rate should apply (and why), and whether interest should be simple or compound? Please provide an Excel sheet with formula/s for calculation.*

> *Q.8: As regards the Claimant's claim for an injunction, as of now what is the evidence on the record which would, or would not give rise to such a final order.*

(x)     The Parties filed their post-hearing briefs on February 3, 2020.

(y)     The Parties filed their reply post-hearing briefs on February 19, 2020 (the Claimant revised its reply post-hearing brief on February 24, 2020).

(z)     The Parties filed their costs submissions on March 3, 2020.

(aa)    The Tribunal closed the proceedings on June 18, 2020 (pursuant to Art. 27 of the ICC Rules).

(bb)    The Tribunal records the following extensions of time (pursuant to Art. 31(2) of the ICC Rules) for the rendering of the Final Award:

-    At its session of December 6, 2018, the ICC Court extended the time limit for rendering the Final Award until March 29, 2019;

-    At its session of March 7, 2019, the ICC Court extended the time limit for rendering the Final Award until June 14, 2019;

-    At its session of June 6, 2019, the ICC Court extended the time limit for rendering the Final Award until March 16, 2020;

-    At its session of March 5, 2020, the ICC Court extended the time limit for rendering the Final Award until May 29, 2020;

-    At its session of May 7, 2020, the ICC Court extended the time limit for rendering the final award until June 30, 2020;

-    At its session of July 2, 2020, the ICC Court extended the time limit for rendering the Final Award until August 31, 2020; and

**EXHIBIT A**

-   At its session of August 6, 2020, the ICC Court extended the time limit for rendering the final award until September 30, 2020.

**B.      The Partial Final Award**

4.      The Tribunal recalls that by PO 8/15 it ruled that it would receive, and then hear argument on the following two questions:

> 1.      As a matter of contractual interpretation according to New York law, does the Agreement confine the Claimant to a right to terminate (with no other remedy available, specifically no remedy in damages) in the event that the Respondent does not purchase the Annual Minimum Purchase for any of Years 3, 4 or 5? Is the answer to this question unambiguously "yes" or "no" as a matter of the terms of the Agreement interpreted according to New York law?
>
> 2.      In the event of an ambiguity in the Agreement being ascertained in the course of answering question 1, what legal impact, if any, does the merger clause have?

5.      The Partial Final Award decided those two questions as follows:

> A.      The Tribunal answers the following question with an unambiguous "no": [A]s a matter of contractual interpretation according to New York law, does the Agreement confine the Claimant to a right to terminate (with no other remedy available, specifically no remedy in damages) in the event that the Respondent does not purchase the Annual Minimum Purchase for any of Years 3, 4 or 5? Is the answer to this question unambiguously "yes" or "no" as a matter of the terms of the Agreement interpreted according to New York law? The Agreement does not confine the Claimant to a right to terminate (with no other remedy available, specifically no remedy in damages) in the event that the Respondent does not purchase the Annual Minimum Purchase for any of Years 3, 4 or 5.
>
> B.      As a direct consequence of the matters set out just above (for the avoidance of doubt, para. H.A of this Partial Final Award which immediately precedes) the second question (In the event of an ambiguity in the Agreement being ascertained in the course of answering question 1, what legal impact, if any, does the merger clause have?) posed by the Tribunal as recorded at para. 3 above does not fall to be considered.

C.     **Factual Context**

6.     The Tribunal now sets out the factual context of this arbitration. What follows is not intended as a comprehensive account of, nor factual findings on, all the allegations as to what did or did not happen as between the Parties; rather, it serves the purpose of elucidating for a reader of this Final Award how, essentially, the Parties have come to be in dispute with one another. Those factual findings which might be strictly necessary to explain the Tribunal's reasoning are described later in this Final Award, as the context might require.  By way of further introductory comment to this factual context, the Tribunal notes that the Parties' submissions in this arbitration are broadly in agreement with one another as to many of the background facts. On the other hand, the Tribunal notes that the Parties hotly dispute the consequences of such facts, even if they generally are in agreement as to most of what transpired as between each other. For completeness, it also is noted by the Tribunal that certain other matters of fact are disputed as between the Parties during the course of their submissions. Insofar as is strictly necessary later on in this Final Award, such disputed matters of fact may be discussed or resolved.

7.     The Claimant was formerly called Nipro Diagnostics, Inc. and was an entity owned by the Respondent (as per p. 7 of the Terms of Reference). It is a developer, manufacturer and marketer of various products for people with diabetes, including a portfolio of blood glucose monitoring supplies and technologies. In 2016, the Respondent sold the Claimant to Shenzhen Xinnuo Health Industry Investment Company Limited ("Sinocare")(see the Preamble of the Agreement just below).  As part of the sale, the Respondent entered into the Agreement (C-001) with the Claimant. The Tribunal will now record a number of clauses from the Agreement (other parts of the Agreement may be recorded later in this Final Award as the context might require).

*Preamble*

> *WHEREAS, NDI* [the Claimant] *is engaged in the manufacture and sale of diabetes management products including Blood Glucose Monitoring Meters and Test Strips, lancets, lancing devices and other diabetic supplements as specified in* **Schedule A** *hereto (the "Products");*

*WHEREAS, on or about the date that this Agreement is executed between the parties, Shenzhen Xinnuo Health Industry Investment Limited (the "Purchaser") executed a Purchase Agreement (the "Purchase Agreement") with Distributor* [the Respondent]*, pursuant to which the Purchaser shall acquire all outstanding shares of NDI from the Distributor subject to the satisfaction of the conditions for Closing as set out in the Purchase Agreement (as defined therein);*

*1.1 With effect from the Effective Date, (a) NDI hereby appoints Distributor as its non-exclusive distributor of the Products for distribution in the territory specified in **Schedule B** attached hereto (the "Territory"); and (b) NDI hereby grants to Distributor a non-exclusive non-transferable license to Distributor to any patents, copyrights, NDI Marks (defined below) and other proprietary information necessary for distribution and exploitation of the Products in the Territory and for no other purpose or use. Distributor hereby accepts such grant and appointment effective as of the Effective Date upon the terms and conditions of this Agreement. **Schedule A** and **Schedule B** may be amended from time to time at any time after the Effective Date by mutual agreement of the parties. As used in this Agreement, (a) the term "Contract Year" means each twelve (12) month period commencing on the Effective Date that this Agreement is in effect; and (b) the term "Annual Minimum Purchase" means annual minimum quantities of certain Products that the Distributor is required to purchase during each Contract Year as set forth in **Schedule C**.*

*2.1 Unless sooner terminated as hereinafter provided, this Agreement shall take effect on the Effective Date and extend for a term of five (5) years from the Effective Date.*

*2.2 Unless terminated by either party by giving to the other written notice of termination a minimum of ninety (90) days prior to the end of the then current term, this Agreement shall be renewed for consecutive two (2) year periods subject to the same period of notice provided that the parties have agreed in writing on the applicable Annual Minimum Purchase for the first Contract Year of any renewal period not less than ninety (90) days prior to the expiration of the then current term. Commencing from the second Contract Year, in the event that the parties have not agreed on the Annual Minimum Purchase for the next Contract Year during the initial or any renewal term, then the parties shall use good faith efforts to mutually agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year; provided, however, that in the event the parties are unable to agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year, then the Annual Minimum Purchase for the next Contract Year shall be the same as that of the then current Contract Year.*

*Notwithstanding the number of renewals, if any, this Agreement is and always shall be interpreted as a fixed term agreement and not an indefinite term agreement.*

*2.3 Except as provided in Sections 2.4 and 2.5 NDI agrees not to terminate this Agreement if Distributor has met the Annual Minimum Purchase requirements as set forth in* **Schedule C**, *attached hereto as adjusted, if necessary, pursuant to Section 2.2.*

*2.4 NDI shall have the right at any time during the initial term or any renewal period hereof, by giving notice in writing to Distributor, to terminate this Agreement forthwith without judicial action upon the occurrence of any of the following events:*

*(i) Distributor's failure to purchase the applicable Annual Minimum Purchase during any Contract Year as set for on* **Schedule C**, *and, as it applies to the first two (2) Contract Years, failure of the Distributor to cure the Purchase Shortfall in accordance with Section 3.2, below;*

*(ii) any breach of this Agreement by Distributor not cured within thirty (30) days after written notice thereof including breach of any open account payment terms which may be negotiated by the parties (timely payments there under being of the essence);*

*……..*

*2.7 Upon the expiration or termination of this Agreement for any reason, Distributor shall cease to use and, at NDI's request and cost, return to NDI or its designee all Confidential Information or any demonstration equipment or materials of any kind supplied by NDI for which Distributor has not paid.*

*……..*

*3.2*

*In the event that Distributor purchases more than the applicable Annual Minimum Purchase for any given Contract Year, the excess quantities of Products purchased in such Contract Year shall not be credited towards the Distributor's obligation to purchase the applicable Annual Minimum Purchase for the subsequent Contract Year. If at the end of each of the first two (2) Contract Years, Distributor has failed to purchase at least the applicable Annual Minimum Purchase for such Contract Year, and NDI was ready, willing and able to deliver such minimum quantities of the applicable Products for such*

*Contract Year, then the "Purchase Shortfall" for such Contract Year shall mean the quantities of applicable Products by which the Annual Minimum Purchase for such Contract Year exceeds the quantities of the applicable Products actually purchased by Distributor for such Contract Year. Subject to Article VI, in the event of a Purchase Shortfall in the first two (2) Contract Years, Distributor shall, without demand from NDI and within thirty (30) days following the end of the applicable Contract Year, at Distributor's option either: (x) purchase quantities of the applicable Products equal to the Purchase Shortfall; or (y) pay an amount to NDI equal to the Purchase Shortfall multiplied by the applicable prices for the Products as set forth on **Schedule A** (as then in effect). For the avoidance of doubt, any payments made for a Purchase Shortfall in connection with the preceding sentence shall not be credited towards the Distributor's obligation (if any) to purchase the applicable Annual Minimum Purchase for a Contract Year following the one in which the Purchase Shortfall took place.*

*……..*

*3.10 Trademarks; Service Marks.*

*The trademarks and service marks set forth in Schedule F, attached hereto (the "NDI Marks") owned by or licensed to NDI are vital to NDI's business. NDI hereby grants to Distributor a limited, non-transferable, non-exclusive, fully paid up license to the NDI Marks, during the term of this Agreement, solely for such packaging and labeling and promotional materials, subject to compliance with NDI's standard quality monitoring guidelines (which shall be provided to Distributor on or before the Effective Date of this Agreement) and Distributor's advance written notification to NDI of any intended use of the NDI Marks, including the provision of samples of such use, to be used solely with the Products. NDI shall retain ownership of the NDI Marks and all associated goodwill and any and all uses of the NDI Marks shall inure to the benefit of NDI or its licensors. Distributor shall have the sole right and responsibility for developing its own trademarks and trade dress for use in connection with the marketing, sale, advertising and/or promotion of its products and services, subject to NDI's reasonable approval, and Distributor shall own such trademark(s) and trade dress and all associated goodwill, and shall prosecute, maintain and enforce such trademarks and trade dress at its own cost and discretion. Distributor further agrees to take reasonable measures to assist NDI in its protecting the NDI Marks. In partial fulfillment of this responsibility, Distributor agrees to notify NDI of any and all uses of these rights by any unauthorized person or entity of which Distributor becomes aware, and to cooperate in any actions by NDI to protect these rights at NDI's expense. Nothing set forth herein shall constitute any grant of license or right to use the NDI Marks other than in connection with the Products and their packaging in*

*accordance with the terms of this Agreement. Distributor shall not use NDI, its corporate name, or any of the NDI Marks in connection with any corporate or business name of Distributor.*

*……..*

### Article XII. — Entire Agreement

*This Agreement and the Schedules attached hereto contains the entire agreement between the parties on this subject. The only consideration for signing this Agreement is the terms and provisions of the Agreement as stated herein. No other promise, representation, or agreement of any kind has been made to or with any person or entity whatsoever to cause the signing of this Agreement. Any previous or contemporaneous oral agreements or representations which had been made between the parties are hereby agreed to be null and void. This Agreement shall not be modified or altered except by another written agreement executed by each of the parties hereto. The provisions of this Agreement shall prevail over any conflicting provisions contained in any printed standard terms originating from NDI or Distributor.*

### Article XIII. — Legal Counsel

*Each party has had (or has been advised to seek) independent legal counsel of his selection in the negotiation of this Agreement. Each party fully understands the facts and has been informed about its legal rights and obligations. Each is signing this Agreement freely and voluntarily intending to be bound by it. The parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafter shall not apply to this Agreement.*

*……..*

### Schedule C
### Minimum Annual Quantities

*The following schedule sets out the Annual Minimum Purchase for each Contract Year during the term commencing on the Effective Date:*

*Contract Year One – 3,400,000 fifty (50) count vials of strips (170,000,000 strips)*

*Contract Year Two – 3,600,000 fifty (50) count vials of strips (180,000,000 strips)*

> *The Annual Minimum Purchase for each subsequent Contract Year shall be as agreed to in writing by the parties ninety (90) days prior to the end of the then current Contract Year. In the event the Parties have not mutually agreed on the Annual Minimum Purchase for any Contract Year, the Annual Minimum Purchase for such Contract Year will be the same as the prior Contract Year.*
>
> *The Annual Minimum Purchase in any given Contract Year shall be reduced by the corresponding volume of applicable Products purchased by any direct customer of Distributor that becomes a direct customer of NDI or its affiliates during such Contract Year.*

8.   The negotiations which led to the sale by the Respondent of the Claimant to Sinocare (and with it, amongst other matters, the entering into of the Agreement) were conducted by executives within the Claimant (see, for example, para. 60 of the Partial Final Award). At that time, those executives were effectively the servants of the Respondent and were negotiating the putative deal with their future masters in Sinocare. Those executives relayed the course of the negotiations to persons further up the hierarchy of the Respondent as these went along, and, ultimately, the deal was finalized. External legal advice was given by Greenberg Traurig to those executives in the course of their negotiations with Sinocare for the purposes of the putative deal. Those executives then became the servants of Sinocare. This approach to the sale of the Claimant by the Respondent to Sinocare has not been gainsayed by the Respondent in this arbitration. It appears to be common ground that the Respondent knew and concurred with the fact that its then servants were negotiating, on its behalf, with the putative purchaser (Sinocare). That putative purchaser would later be the effective employer of those negotiating. This approach does not appear to have caused the Respondent any pause for thought.

9.   The Agreement is signed by Scott Verner (one of the negotiators) and Yoshihiko Sano (President of the Respondent). Scott Verner was, up to the moment of the finalization of the deal, an employee of the Respondent, and thereafter was an employee of Sinocare. The Tribunal notes that the Agreement is not isolated or separate from the deal, but is specifically part thereof as noted in the text of the second paragraph of its Preamble (see above, para. 7). The negotiations were, at all times, as between the Respondent (through its chosen negotiating team, which was led by Mr Verner) and Sinocare.

10.    As is discussed below, there are disputes between the Parties as to what was, or was not, communicated to those in authority within the Respondent from its chosen negotiating team as the negotiations went along. There are disputes between the Parties as to the consequences of such communications. Those are matters which are dealt with, insofar as is found to be necessary, below. The Tribunal simply notes this for the present.

11.    What does not appear to be in dispute between the Parties is that the performance of the first two Contract Years passed without much ado (as noted in para. 28 of the Partial Final Award, the Parties were by that time operating Contract Year Three, and is therefore a ready and obvious inference that neither side was dwelling on the rights or wrongs of performance of the two prior Contract Years). Where things went awry was when the Parties started contemplating Contract Year Three (which was calendar year 2018). The Tribunal will now set out the sequence of contemporaneous correspondence[4] in that regard.

12.    By email dated October 4, 2017 (C-003), the Claimant reached out to the Respondent as follows:

> *I am working on 2018 units projections. Can you share with us Nipro estimated units volume for 2018 for our Budget process?*
>
> *Please let me know.*

13.    By email dated October 26, 2017 (C-005), the Respondent replied as follows:

> *As I informed by SMS to you in this week, let me inform you about estimated purchase qty for 2018 as below. thank you for waiting.*

---

[4] The Tribunal notes that the in late 2016 and into 2017 the Respondent wished to have a meeting with the Claimant to have "a consensus with our office for future business" (extract from an email dated January 5, 2017, from the Respondent, R-051) but the latter questioned the need to have representatives from a wide geographic spread.

> *After consideration about the current situation of our Trividia business, our strips purchase qty target will be 27Mpcs, means 540,000 vials of 50ct test strips in 2018.*
>
> *The number is estimated presuming that Trividia will not directly sell the product our [sic] existing customers.*
>
> *If you are planning such sales, please let us know. Then we may propose different number at that time.*
>
> *Thank you for your kind attention. Kindly confirm by return for your acceptance.*

14.   This proposal on the part of the Respondent was, by comparison to the Annual Minimum Purchase for Contract Year Two, a reduction of 85% on the then current year.

15.   By email[5] dated November 8, 2017 (C-006), the Claimant replied to the Respondent as follows:

> *We reviewed your estimated units purchase for 2018 and we were startled to see the 85% reduction compare to 2017.*
>
> *Please provide Nipro Offices 2018 estimated units purchase by product (Item Code) and country for our review.*

The Respondent, that day (R-042), replied and stated that it would not be possible to give "Item code wise break down", and gave a regional break down ("EU: 20Mpcs Latam: 5Mpcs Asia: 2Mpcs (For Au, we assume to supply till mid of 2018, but if new tender supply will delay, we need to buy additional qty. Since we cannot expect to get new tender in AU in 2018 with you produts [sic]) ".

16.   On November 21, 2017, the Claimant (by email, within R-042), asked the Respondent for units forecast by month and item code for the purpose of 2018. The following day, the Respondent replied (within R-042) to the effect that it only had the data it provided as per its purchase forecast, and asked whether they could consider that the 2018 volume

---

[5] There was a short follow-up email from the Respondent to the Claimant on November 6, 2017 (R-042).

as agreed at its requested amount. By email dated December 8, 2017 (C-007), the Claimant pressed the Respondent for the information sought on November 8, 2017, so that it could "have a more substantive discussion with the senior team at [the Claimant] and then communicate back to you next steps."

17.  By email dated December 21, 2017 (C-008), the Claimant told the Respondent that the latter's proposal (85% less than Contract Year Two) was not acceptable, and that a higher volume commitment was needed "by the end of this calendar year or per the [Agreement] we will revert back to the last year's volume for 2018".

18.  By email dated December 28, 2017 (C-009), the Respondent set out its position in respect of Contract Year 3:

> *Section 2.2 of* [the] *Agreement requires that* [the Respondent] *and* [the Claimant] *act in good faith to establish the "Annual Minimum Purchase" for 3rd and subsequent years.*
>
> *As* [the Claimant] *has previously acknowledged, the prohibition on* [the Respondent] *marketing and distributing competing products contained in Section 2.4 of the Agreement expires at the end of 2017.*
>
> [The Respondent] *has complied fully with this prohibition to date, but anticipates that in the future it may begin distributing competing products when it is contractually permitted to do.*
>
> *Accordingly, the purchase volume estimates provided by* [the Respondent] *reflect* [its] *good faith estimate of the reduced volume of future product sales of* [the Respondent].
>
> *Addition to above, we realized that* [the Claimant] *has started direct business in some area where* [the Respondent is] *doing business. This is also one of the important reason of the reduction.*
>
> [The Respondent] *believe the provisions of Section 2.2 of the Agreement require that the parties act in good faith in establishing reasonable and achievable purchase volumes beginning in 2018, based on current business plans and market conditions.*

[The Claimant's] *summary rejection of* [the Respondent's] *good faith estimate of its 3rd year purchase volume is inconsistent with both the letter and spirit of this provision.*

*We continue to be willing to discuss our business plans and agree on an appropriate purchase volume, but we strongly disagree with* [the Claimant's] *assertion that it is contractually permitted to unilaterally impose the 2nd year purchase volume for 3rd year.*

*As our respective legal counsel has discussed,* [the Respondent] *also believes based on the clear terms of our Agreement, as well as the commercial intentions of both parties, that* [the Respondent] *is not responsible for any "Purchase Shortfall" relating to 2018 or subsequent years.*

*Based on the apparent unwillingness of* [the Claimant] *to discuss in good faith a reasonable purchase volume for 3rd year* [the Respondent] *intends to continue to order products from* [the Claimant] *based on the 3rd year forecast we have provided to you.*

*We hope we can reach mutual agreement for target qty as per our numbers. As a business partner, we willing to have opportunity to have further discussion.*

19.   On January 4, 2018 (C-010), the Claimant replied to the Respondent:

*On numerous occasions,* [the Claimant] *has offered to work and partner with* [the Respondent] *in good faith during the term of this distribution arrangement.* [The Claimant] *has never received any Sales Reports from* [the Respondent] *as specified in Section 3.11 of the agreement, we have not received any forecast information from* [the Respondent] *since May 2017, and recently learned that* [the Respondent] *has begun marketing competing products from another distributor as evidenced from a product registration in Australia. Additionally, we worked with various* [Respondent] *offices to support lower prices than our agreed upon price in the Agreement for local tenders in New Zealand and Uruguay. Finally,* [the Claimant] *has been working with all of the* [Respondent's] *offices on the name change and has invested in packaging to ensure they continue to sell in local markets.*

*Your statement that "*[the Claimant] *has started direct business in some areas where we are doing business" is incorrect.* [The Claimant] *has honored this distribution agreement and to date, has not entered into any contracts with* [the Respondent's] *customers, nor have we sold product into any territories where* [the Respondent] *is doing business. Even if we did sell into these territories we recognize that the agreement allows us to do so and any amounts would be reduced from any current/future Annual Commitments.*

*I previously shared the shock and disappointment from my senior management team when it was recently informed by you that* [the Respondent's] *proposed purchase level for Year Three of the Agreement is 27 MPCS, which represents an 85% reduction in the amount that was purchased from year 2. These significantly reduced purchase levels are not acceptable. In an effort to demonstrate our good faith commitment to* [the Respondent], [the Claimant] *is willing to reduce year 3 annual minimum volumes to that which were agreed to in year 1, approximately 3,400,000 fifty (SO) count vials of strips (170,000,000 strips). As you know, the agreement requires that if the parties are unable to agree on the annual minimum purchase prior to the end of the then current year, which in this case is January 6, 2018, then the annual minimum purchase for year 3 will be the same as year 2. Therefore,* [the Claimant] *is making this offer, which is a significant concession, as a sign of good faith and to show you our commitment to* [the Respondent]. *As explained previously, we disagree with your statement that* [the Respondent] *is not liable for the failure to meet the annual minimum purchase requirements for years 3 -5.*

*I am happy to discuss this further at your convenience.*

20. This proposal was not accepted by the Respondent and its email of January 15, 2018 (R-042) to the Claimant sets out its further position:

*I am writing this note to respond to your note as of January 4th, 2018*

*Regarding your comment related to sales report and forecast, we note that* [the Claimant] *has not requested such reports and* [the Respondent] *is under no obligation under Section 3.11 or anywhere else unless* [the Claimant] *requests such reports or forecasts.*

*I also want to correct your suggestion regarding* [the Respondent] *marketing competing products from another distributor.*

*While* [the Respondent] *has sought a registration in Australia,* [the Respondent] *has not started any marketing in any territory provided in the above Agreement.*

*Rather than discuss these tangential non-issues, we should focus on the real issue before us. Namely, what should the 3rd year minimum be and what happens if there is a shortfall.*

> *As we have said before, the parties are required to negotiate the third year minimum in good faith, which we have sought to do by providing our realistic forecast for the third year.*
>
> *Given* [the Claimant's] *pricing, it continues to be increasingly difficult to sell* [the Claimant's] *product in our markets. We appreciate your suggestion of reverting to the year one target; however, it is not realistic.*[6]
>
> *That said,* [the Respondent] *may agree to your proposal of the third year annual minimum volume as same as that of the first year depending on* [the Claimant's] *position on any shortfall.*
>
> [The Respondent] *does not change its understanding of the parties' intent as to what happens if* [the Respondent] *fails to meet the minimum in years 3-5.*
>
> *The responsibility to pay any shortfall is only for the first and second year.* [The Claimant's] *remedy in years 3-5 is only termination.*
>
> *That was expressly what both sides agreed to at the beginning as Mr. Craig Roeder,* [the Respondent's] *attorney, has already explained the reasons to Ms. Sigrid Mccawley,* [the Claimant's] *attorney already.*
>
> *Please let me know whether* [the Claimant] *and* [the Respondent] *should make a written agreement for the amount of the annual minimum volume for the third year.*

21. The arbitration commenced on February 27, 2018. While the foregoing is, in the appreciation of the Tribunal, the basic factual background as to how the Parties came into dispute with one another leading to this arbitration, one other factual matter is recorded at this juncture, namely, certain of the contents of a letter dated January 16, 2019 (C-065), from the Claimant to the Respondent:

> *First, Nipro is in breach of the IDA by reason of its unauthorized use of Trividia's trademark. (See IDA §§ 3.10; 16.5; 3.1 and Schedule F.) Nipro's conduct is particularly egregious because it has used Trividia's trademark to direct customers to competing products. The parties' IDA makes clear that Trividia's trademarks and service marks are a vital and integral part of its business and cannot be infringed or misused by Nipro. Section 3.10 makes plain*

---

[6] The Tribunal notes, in passing, that the Claimant's proposal to revert, for the purposes of Contract Year 3, to the volume which was applicable in Contract Year 1, amounted to a reduction of 200,000 vials from 3,600,000 (Contract Year 2), namely, approximately 5.5%.

*that the trademarks constitute valuable business assets and Section 16.5 allows for immediate injunctive relief in court for any breach or threatened breach. Moreover, Schedule F makes clear that:*

*"In addition to the list of trademark and logos below **Distributor will not use the "True" in the marketing or distribution of any products other than the Products included in the Agreement.**"*

*For example, On November 26, 2018, Nipro used the trademark on a letter to costumers of Trividia's products in an effort to mislead them into "upgrading" to Nipro's new "GlucoKey" product. Specifically the correspondence, which is attached hereto as exhibit A, reads as follows and is on "GlucoKey" letterhead:*

*"Dear TRUE customer,*

*Thank you for upgrading to our newest meter the GlucoKey. Complete with Keytone Testing, this meter is the key to unlocking your glucose management. The test strips are available through NDSS from the 1st December onwards. The Order code is 318. For more information visit our website at www.glucokey.com.au or call us at 1800 451-737.*

*Nipro Diabetes Team"*

*Second, Nipro has breached the IDA by failing to meet the Annual Minimum Purchase Requirements for Contract Year Three. Nipro only purchased 1,338,812 fifty (50) count equivalent units during 2018 and failed to purchase the remaining 2,261,488 fifty (50) count equivalent units to meet the Annual Minimum Purchase Requirement for Contract Year Three (which pursuant to the IDA is set at the same level as Contract Year Two). Trividia notes that any continued discussions between the parties concerning the IDA shall not be deemed a waiver of Trividia's claim of breach. While we are aware that the Tribunal has set a hearing for March 11 – 13, 2019, we write today to provide Nipro with Notice pursuant to the IDA that Trividia contends Nipro is presently in breach of the IDA by failing to meet the Annual Minimum Purchase Requirements for Contract Year Three and it does not waive or relinquish in any way its right to pursue all damages under the IDA based on this breach pending the Tribunal's ruling in March 2019.*

*Nipro is also in breach of the IDA for failing to provide any forecasts for Contract Year Four despite Trividia's repeated requests. During Contract Year Three, Trividia's business was harmed by not having the required forecasts necessary to adequately plan future manufacturing needs. Nipro has further breached the IDA by not engaging in good faith discussions regarding the purchase minimum for Contract Year Four, despite receiving multiple requests*

*for forecasts from Trividia.*

*Trividia demands that Nipro immediately cease its misuse of Trividia's trademarks and remedy the harm caused to Trividia's brand internationally and compensate Trividia for the damages it has suffered by Nipro's breaches relating to Contract Years Three through Five. Failure to cure these breaches will result in the immediate transfer of all product registrations and distribution rights in accordance with the IDA. In a final effort to resolve these issues amicably, Trividia is willing to meet with Nipro to discuss resolution of these issues in the next twenty (20) days. If Nipro is unwilling to meet, please notify us by no later than Tuesday, January 22, 2019, because Trividia will be forced to pursue an injunction in federal court for Nipro's egregious breaches of its trademarks and related harm to its international business.*

## D.      Claims made by the Parties

22.   The Tribunal now records the prayers for relief as finally articulated by the Parties prior to the hearing.

23.   The Claimant seeks the following relief (from its Statement of Reply, noted at para. 4(t)):

*340. Trividia respectfully requests that the Tribunal allow its claims to proceed and grant the following relief:*

*• Grant Trividia's claim that Nipro breached the IDA by failing to make the Annual Minimum Purchase for Contract Year Three thereby resulting in termination of the IDA and award expectancy damages under New York law for Contract Years Three through Five. See IDA Sections 1.1; 2.1; 2.2; 3.2; Article V; Schedule A; Schedule C; Schedule D.*

*o Respondent conceded that the Annual Minimum for Contract Year Three should be the same as Contract Year Two. The Contract Year Two Annual Minimum was 3,600,000 fifty (50)-count vials of strips (180,000,000 strips) equalling $18,900,000 in purchases. As a result of Respondent's breach and resulting termination of the IDA, the Contract Year Two Annual Minimum also applies for Contract Years Four and Five. Respondent failed to purchase the required 50-ct. equivalent test strip vials of product in Contract Year Three.*

*o Trividia's expert report details the damages requested. (CER-1 Suppl. Kindler at Exhibit 1). As set forth in Trividia's Nov. 1, 2019 expert report (CER-1 Suppl. Kindler at ¶ 15 and Table 2) the expectancy damages relating to the*

*breach of the agreement of failing to meet the Annual Minimum Purchase requirement are as follow:*

*- Contract Year Three: $8,168,888*
*- Contract Year Four: $8,679,260*
*- Contract Year Five: $10,796,311*
*- **Total: $27,644,459***

*These numbers are present value numbers. In addition, under New York law, the Trividia is also entitled to prejudgment interest at a rate of 9%.*

• *Grant Trividia's claim for breach of the IDA for Nipro's misuse of Trividia's trademarks in violation of the parties' agreement (which entitles Trividia to expectancy damages in the amount, at least, of the damages relating to Contract Years Three through Five of $27,644,459 as set forth above because it was forced to terminate the IDA as a result of the breach).*

• *Grant Trividia's trademark infringement claims and award related damages including treble, punitive and statutory damages as allowed by law. As set forth in Expert, Kindler's supplemental report, Trividia Request an award of damage as follows as set forth in Expert Kindler's Report:*

Table 1[14]
**Summary of Trivida's Claimed Damages**

| | | |
|---|---|---|
| **Trivida's Breach of Contract Damages from AMP**[15] | **[A]** | $27,644,459 |
| **Nipro's Revenue Subject to Disgorgement and Future Discounted Revenue** | | |
| Through Dec. 15, 2019 | [B] | $1,199,889 |
| *Dec. 16, 2019 to 2022 Q3* | [C] | $2,551,821 |
| **Total for 4-Year Meter Life** | **[D]=[B]+[C]** | $3,751,710 |
| | | |
| *Dec. 16, 2019 to 2025 Q3* | [E] | $4,501,450 |
| **Total for 7-Year Meter Life** | **[F]=[B]+[E]** | $5,701,339 |
| **Trivida's Lost Profits** | | |
| Through Dec. 15, 2019 | [G] | $693,370 |
| *Dec. 16, 2019 to 2022 Q3* | [H] | $1,425,786 |
| **Total for 4-Year Meter Life** | **[I]=[G]+[H]** | $2,119,156 |
| | | |
| *Dec. 16, 2019 to 2025 Q3* | [J] | $2,515,107 |
| **Total for 7-Year Meter Life** | **[K]=[G]+[J]** | $3,208,477 |
| | | |
| **Trivida's Lost Profits Assuming 50% Replacement**[16] | **[L]** | $4,170,014 |
| **Total, 4-Year Meter Life, Breach of Contract Damages from AMP and Trebled Nipro's Revenue Subject to Disgorgement and Future Discounted Revenue** | **[M]=[A]+3\*[D]** | $38,899,589 |
| **Total, 7-Year Meter Life, Breach of Contract Damages from AMP and Trebled Nipro's Revenue Subject to Disgorgement and Future Discounted Revenue** | **[N]=[A]+3\*[F]** | $44,748,476 |
| **Total, 4-Year Meter Life, Breach of Contract Damages from AMP and Trebled Lost Profits Damages**[17] | **[O]=[A]+3\*[I]** | $34,001,927 |
| **Total, 7-Year Meter Life, Breach of Contract Damages from AMP and Trebled Lost Profits Damages**[18] | **[P]=[A]+3\*[K]** | $37,269,891 |
| **Total, Breach of Contract Damages from AMP and Trebled Lost Profits Damages Assuming 50% Replacement**[19] | **[Q]=[A]+3\*[L]** | $40,154,503 |
| **Total, 4-Year Meter Life, Breach of Contract Damages from AMP, Trebled Nipro's Revenue Subject to Disgorgement and Future Discounted Revenue, and Trebled Lost Profits Damages** | **[R]=[A]+3\*([D]+[I])** | $45,257,057 |
| **Total, 7-Year Meter Life, Breach of Contract Damages from AMP, Trebled Nipro's Revenue Subject to Disgorgement and Future Discounted Revenue, and Trebled Lost Profits Damages** | **[S]=[A]+3\*([F]+[K])** | $54,373,908 |

• *Grant Trividia's request for treble, statutory and punitive damages.*

• *Grant Trividia's claim for injunctive relief based on Nipro's infringement and misuse of Trividia's trademarks and permanently enjoin Nipro's acts of trademark infringement.*

• *Grant Trividia's claim for breach of the IDA by failing to provide requested forecasts for Contract Year Four and award related damages. As a result of Nipro's breach of the IDA, Trividia was forced to terminate the IDA.*

• *Deny Nipro's reformation and rescission claims with prejudice as a result of their withdrawal of those claims on the eve of the scheduled March, 2019 hearing.*

• *Grant Trividia and adverse inference on the issue of customer confusion in Europe and strike Tom Rosseel's witness statement and testimony based on Nipro's failure to produce.*

• *Grant Trividia prevailing party attorney's fees, costs and expenses associated with this matter as provided for in Article XIV of the IDA.*

• *Grant pre-judgment interest pursuant to New York law, which is presently at a rate of 9%.*

• *Grant such other relief to Trividia as the Tribunal may conclude is just and proper.*

24.   The Respondent seeks the following relief (from its Statement of Rejoinder, noted at para. 4(u)):

**WHEREFORE,** *Nipro respectfully requests that a final award be issued as follows:*

*A. A ruling in Nipro's favor declaring that Trividia may not obtain a monetary damage award for any failure by Nipro to purchase the Annual Minimum Purchase amounts for Contract Years Three through Five that was caused by (i) Trividia's wrongful conduct, and/or (ii) mutual mistake, related to the formation of the parties' IDA; and*

*B. An award in Nipro's favor that:*

*i. Reforms the IDA to include an express limitation on liability such that Trividia may not obtain monetary damages from Nipro if Nipro fails to purchase the Annual Minimum Purchase amounts in Contract Years Three, Four and/or Five; and/or*

*ii. Rescinds the IDA such that the IDA is not enforceable for Contract Years Three through Five; and/or*

*iii. Rescinds the Annual Minimum Purchase obligations in the IDA to the extent they otherwise could give rise to any monetary damages claim under the IDA in Contract Years Three, Four and/or Five; and/or*

*iv. Rescinds the Annual Minimum Purchase obligations in the IDA for Contract Years Three, Four, and Five, as reflected in the following severable terms of that agreement:*

> *a. Commencing from the second Contract Year, in the event that the parties have not agreed on the Annual Minimum Purchase for the next Contract Year during the initial or any renewal term, then the parties shall use good faith efforts to mutually agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year; provided, however, that in the event the parties are unable to agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year, then the Annual Minimum Purchase for the next Contract Year shall be the same as that of the then current Contract Year. IDA, § 2.2.*

> *b. The Annual Minimum Purchase for each subsequent Contract Year shall be as agreed to in writing by the parties ninety (90) days prior to the end of the then current Contract Year. In the event the Parties have not mutually agreed on the Annual Minimum Purchase for any Contract Year, the Annual Minimum Purchase for such Contract Year will be the same as the prior Contract Year. IDA, Schedule C;*

> *and/or*

*v. Otherwise fashions equitable relief, including but not limited to any combination of the actions set forth in (i) - (iv), for the purpose of preventing Trividia from benefitting from its wrongful conduct, and/or mutual mistake, by seeking recovery of monetary damages under the IDA for any failure by Nipro to purchase the Annual Minimum Purchase amounts in Contract Years Three, Four and/or Five;*

*C. An award in Nipro's favor denying Trividia's claims and prayers for relief in their entirety:*

*i. Denying Trividia's claim that Nipro breached the IDA by failing to make the Annual Minimum Purchase for Contract Year Three;*

*ii. Denying Trividia's claim that Nipro misused Trividia's trademarks in breach of the IDA;*

*iii. Denying Trividia's claim that Nipro breached the IDA by failing to provide forecasts for Contract Year Four;*

*iv. Denying Trividia's claim for breach of contract damages sought for Contract Years Three through Five, including claims for damages in the amount of $8,168,888 for Contract Years Three, $8,679,260 for Contract Year Four, and $10,796,311 for Contract Year Five, and the claim for prejudgment interest;*

*v. Dismissing Trividia's non-contractual trademark infringement claims (Counts IV-IX) as beyond the scope of the Tribunal's jurisdiction and, in the alternative, denying said claims on the merits;*

*vi. Denying Trividia's claim for damages for trademark infringement, including treble, punitive and statutory damages, and denying Trividia's claim for disgorgement and lost profits;*

*vii. Denying Trividia's claim for injunctive relief;*

*viii. Denying Trividia's claim that Nipro may not assert reformation and rescission claims concerning the IDA;*

*ix. Denying Trividia's claim for attorneys' fees, costs and expenses;*

*D. An award in Nipro's favor declaring that Nipro is the prevailing party in this Arbitration;*

*E. An award in Nipro's favor granting Nipro attorney's fees, costs and expenses;*

*F. An award in Nipro's favor granting such other relief to Nipro as the Tribunal may conclude is just and proper.*

## E.    Discussion & Analysis

*Introduction – Arrangement of Issues*

25.   It is within the procedural discretion of the Tribunal to decide the sequence of its reasoning. Following careful consideration of the entire case file in this arbitration, and also most particularly the prayers for relief of the Parties as recorded in the previous section of this Final Award, the Tribunal considers that following arrangement of issues is appropriate and logical:

(a)     Should the terms of the Agreement be adjusted in some manner, or not at all? The Tribunal deliberately uses the word "adjusted" at this point so as to convey the substance of the point rather than use any particular legal labels or doctrines (these will be precisely discussed below). This issue arises from the position taken by the Respondent as regards the Agreement, in particular its prayers for relief which seek reformation and/or rescission. The Tribunal considers that the resolution of this issue falls logically to be decided first before addressing any of the Claimant's claims as the latter appear to be based on the performance of the Agreement according to its existing terms. There is little point in analysis of the Claimant's claims in those circumstances if it were to later transpire that the Agreement required adjustment (which would then logically require a re-examination of the Claimant's claims). The Tribunal notes at this point that the Claimant has sought to exclude these arguments of the Respondent on the basis that the latter stated on March 11, 2019 (as recorded at para. 3(k) above) that its affirmative defenses were withdrawn without prejudice given that the Agreement was terminated. On November 2, 2019, the Tribunal wrote to the Parties as follows: "Given the imminence of the hearing the Tribunal has immediately considered the following paragraph in the Claimant's Reply: '196. Trividia respectfully requests that this Tribunal rule on this issue in advance of the December 16, 2019, hearing date and find that Nipro's last-minute withdrawal of its affirmative claims was with prejudice and those claims will not be heard by this Tribunal. An advanced ruling will save both parties the time and expense relating to preparing witnesses for the December 16, 2019, hearing on the rescission and reformation claims. As set forth below, this issue is a question of law that does not require extensive factual development, and is thus properly suited to an advance resolution.' In the context of an ICC arbitration the Tribunal is not going to rule in the manner sought in advance of the hearing. However, the Tribunal wishes to make it clear that no inference whatsoever as to the final disposition of this, or any other pending issue should be drawn." The Tribunal, having reviewed the Respondent's position as articulated on March 11, 2019, does not consider the Claimant's characterisation (i.e. that the withdrawal of the affirmative defenses was effectively with prejudice) to fairly comport with what was actually written. The withdrawal of the affirmative defenses was

both stated expressly to be without prejudice, but also in a particularly narrow context of a concession solely as to Contract Year Three annual minimum purchases. As the arbitration evolved after that point, it was clear that the Claimant was not confining itself to a claim for Contract Year Three, but also the subsequent two contractual years. This, in the Tribunal's estimation, brought back into play the entire panoply of the Respondent's affirmative defenses as it would be, procedurally, opportunist, to say the least, for the Claimant to extrapolate a wide concession from the Respondent's position on March 11, 2019, to permit it to pursue its Contract Years Three-to-Five claims with those defenses substantively blocked. Also, the Claimant's request for an "advanced ruling" was not procedurally possible in the context of an ICC arbitration (the Tribunal is not, as might be the case with a municipal court, imbued with the authority to issue dispositive rulings on significant matters of substance without following the due procedure of submitting a draft award on the subject for ICC scrutiny, and so on).

(b)      If the answer to the previous question is that the Agreement is to be adjusted, then depending on the extent of such adjustment, the Tribunal would examine the consequences for the case. If, however, the answer to the previous question is that the Agreement is not to be adjusted, then the Tribunal considers that the next issue is whether or not the Parties (particularly the Claimant) engaged in good faith efforts (as a matter of clause 2.2 of the Agreement) to mutually agree on the Annual Minimum Purchase for Contract Year Three. Depending on the answer to that question the Tribunal will examine the consequences for the case.

(c)      The next issue which logically follows (of course, dependent on what may have flowed from the answers to the previous questions) is whether the termination of the Agreement asserted by the Claimant in March 2019 (as noted at para. 3(k) above) was legally sound. Depending on the answer to that question the Tribunal will examine the consequences for the case (including damages).

(d)      The next issue which logically follows (again, of course this is dependent on what may have flowed from the answers to the previous questions) is whether the Claimant's allegations concerning the Respondent's use, or not as the case may be, of proprietary information or marks, are substantiated, and if so, what consequences might flow.

(e)      Depending on the outcome of the foregoing issues, the Tribunal will then examine whether, or if there are any other issues (save for interest and costs) which arise from the Parties' submissions which might, or might not require resolution. The Tribunal does not consider it necessary to specify whether there are any such other issues at this stage, but simply notes that it might, or might not be necessary (depending on the analysis which is about to commence) to discuss and decide matters arising.

*Should the Agreement be adjusted in some way?*

26.   Since the Partial Final Award the Tribunal has given considerable time to understand, precisely, the case as made by the Respondent that, notwithstanding the terms of the Agreement as interpreted according to New York law (the Tribunal refers back in general to the Partial Final Award in that regard), the obligations should be adjusted in some way. While these have already been recorded above, the Tribunal repeats the precise prayers for relief as advanced by the Respondent which, on their face, seek this type of remedy:

> *A. A ruling in Nipro's favor declaring that Trividia may not obtain a monetary damage award for any failure by Nipro to purchase the Annual Minimum Purchase amounts for Contract Years Three through Five that was caused by (i) Trividia's wrongful conduct, and/or (ii) mutual mistake, related to the formation of the parties' IDA; and*

> *B. An award in Nipro's favor that:*

> *i. Reforms the IDA to include an express limitation on liability such that Trividia may not obtain monetary damages from Nipro if Nipro fails to*

*purchase the Annual Minimum Purchase amounts in Contract Years Three, Four and/or Five; and/or*

*ii. Rescinds the IDA such that the IDA is not enforceable for Contract Years Three through Five; and/or*

*iii. Rescinds the Annual Minimum Purchase obligations in the IDA to the extent they otherwise could give rise to any monetary damages claim under the IDA in Contract Years Three, Four and/or Five; and/or*

*iv. Rescinds the Annual Minimum Purchase obligations in the IDA for Contract Years Three, Four, and Five, as reflected in the following severable terms of that agreement:*

> *a. Commencing from the second Contract Year, in the event that the parties have not agreed on the Annual Minimum Purchase for the next Contract Year during the initial or any renewal term, then the parties shall use good faith efforts to mutually agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year; provided, however, that in the event the parties are unable to agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year, then the Annual Minimum Purchase for the next Contract Year shall be the same as that of the then current Contract Year. IDA, § 2.2.*

> *b. The Annual Minimum Purchase for each subsequent Contract Year shall be as agreed to in writing by the parties ninety (90) days prior to the end of the then current Contract Year. In the event the Parties have not mutually agreed on the Annual Minimum Purchase for any Contract Year, the Annual Minimum Purchase for such Contract Year will be the same as the prior Contract Year. IDA, Schedule C;*

> *and/or*

*v. Otherwise fashions equitable relief, including but not limited to any combination of the actions set forth in (i) - (iv), for the purpose of preventing Trividia from benefitting from its wrongful conduct, and/or mutual mistake, by seeking recovery of monetary damages under the IDA for any failure by Nipro to purchase the Annual Minimum Purchase amounts in Contract Years Three, Four and/or Five;*

27.  It might appear, and the Tribunal has carefully considered this, that the Respondent is seeking to have the Agreement adjusted so that it, effectively, has no obligation to purchase any product from the Claimant for Contract Years Three-Five inclusive. That

seems to emerge from the specific relief phrased by the Respondent as follows when it seeks an award which: "[*R*]*eforms the IDA to include an express limitation on liability such that Trividia may not obtain monetary damages from Nipro if Nipro fails to purchase the Annual Minimum Purchase amounts in Contract Years Three, Four and/or Five*". While not as bluntly expressed as the Tribunal's formulation in the first sentence of this paragraph, that is, apparently, exactly the consequence of that which the Respondent seeks. If the Claimant cannot obtain monetary damages from the Respondent in the event that the latter fails to purchase Annual Minimum Purchase amounts, then that is tantamount to there being no obligation on the part of the Respondent to buy anything (save for whatever it chooses to buy).

28.  The same consequence (*i.e.* no obligation, effectively, on the part of the Respondent to buy any product for Contract Years Three-Five inclusive) emerges from the Respondent's reliefs which seek to rescind the Agreement in its entirety (or partly). Effectively the Respondent asks the Tribunal to excise from the Agreement any express obligation which might lead to it having to buy anything, beyond that which it chooses to purchase, in Contract Years Three-Five inclusive.

29.  On any analysis, that which the Respondent asks of the Tribunal represents a significant, even profound change to the terms of the Agreement; a five-year duration would, to all intents and purposes, turn into a two-year obligation with, at best, some optional right on the part of the Respondent purchase as it saw fit. This was confirmed in testimony before the Tribunal by Kazuo Wakatsuki when he said (p.780 of the transcript):

> *Whereas, Nipro and my position is that the amount was determined for years one and two, but there was no determination for years three, four, and five and there was no commitment for that, and, therefore, there is no penalty or damages.*

30.  The Tribunal recalls now the origin of the Respondent's arguments in this regard. In short, it says (*e.g.* at para. 18 of its reply submission of February 15, 2019) that when its lead negotiator, Mr Verner, sent it a draft of the Agreement on October 17, 2015, following his negotiations with Sinocare, it immediately pushed back on a number of

matters, including the proposed volume commitment and imposition of damages for any failure to purchase those volumes.

31.   The draft of the Agreement to which the Respondent refers (R-094) has a provision by which the Parties were to agree, not less than 90 days prior to the expiration of a particular contract year, the annual quantity for the following year (*i.e.* a roughly similar position to that which made its way into the Agreement). However, in the event of there being no agreement to such annual quantity, the default position (clause 2.2.) was that 120% of the minimum quantity of the current year would apply. Schedule C to that draft provided for Contract Year One minimum annual quantity of 225,000,000 strips, but no further specific figures for subsequent years, save that, curiously, in the event of there being no agreement the minimum annual quantity would be 110% (not 120%) of the prior Contract Year.

32.   The Respondent refers to an email of October 19, 2015 (R-072) whereby it tells Mr Verner that it has comments "back from Nipro Corp. Global Division as follows. 1……a. There should not be any volume commitment and penalty clause associated with the committed volume. Newco will freely appoint distributer, by this volume commitment cannot be made".

33.   Mr Verner emailed (R-013) the Respondent on October 20, 2015, to indicate his views on the comments and he makes it clear that *"[I]f Nipro wants me to push back on this I will, I firmly believe this still stop the process, lower the purchase price of Nipro Diagnostics and potentially risk the deal"*.

34.   Following a conversation which Mr Verner then had with Sinocare, he sent an email dated October 21, 2015 (R-037), to the Respondent which is given central importance by the latter (emphasis added): "[T]oday I had a conference call with them, to negotiate and finalize. Allow me to share the results. **1. Nipro will only commits to purchases for years one and two. Future years will be negotiated annually. a. No penalty for years 3,4, or 5**".

35.  On October 24, 2015, Tomohiro Somekawa (of the Respondent, but at the relevant time was based in the United States assisting Mr Verner and communicating with the then parent of the Claimant, the Respondent) sent an email (R-093) to Kazuo Wakatsuki and Kimihito Minoura (both in Japan). Mr Somekawa told his colleagues that "Annual Minimum Purchase Volume for 3rd year and after will be 100% of those of each previous year in case both parties cannot agree, and there will be no penalty to purchase the lacking volume even if it does not reach to the volume".

36.  As regards the exact circumstances of the execution of the Agreement by the Respondent, Mr Minoura testified (p. 823 of the transcript) as follows during his cross-examination:

> *Q. So I guess my point is this: You will agree that to the extent that the decision-makers and the signatory at Nipro had any idea as to what was in the IDA and what was supposed to be in the IDA, it was based on what was in the Ringi, correct?*
>
> *A. Yes, I think that's right.*

37.  The "Ringi", namely, a detailed memorandum prepared by Mr Minoura (confirmed at p. 819 of the transcript) describing the deal as a whole, is the document referred to just above in the quotation from his cross-examination. The Ringi (R-357, p.11 thereof in translation) sets out his summary of the Agreement prior to its signature by the Respondent. Adjacent to "Schedule C" is the following summary (emphasis added):

> *Annual minimum purchase quantity (strip)*
> - *First year: 3.4 million vials (170 million pieces)*
> - *Second year: 3.6 million vials (180 million pieces)*
> - ***no commitment in and after 3rd year**.*
> - *If existing customers start to buy directly from NCO within 2 years, deduct from the minimum purchase quantity*

38.   The portion of the Ringi in bold text, quoted just above, was the subject of cross-examination of Mr Minoura (pp. 828-829 of the transcript in particular) during which he conflated the "no commitment in and after 3rd year" language with the "no penalty" language contained in Mr Verner's email as recorded above at para. 33. Mr Minoura testified, in particular, as follows:

*Q. Sir, what do you mean by "penalty"?*

*A. It means something along the lines of purchasing of the shortage portion or making additional payments when the promised volumes were not met.*

*Q. So purchasing the volume that was short or making additional payments, that's what you understood penalty to be, right?*

*A. Yes.*

By way of continuation and shortly after this testimony, Mr Minoura was questioned by the Tribunal as follows (pp. 838-842 of the transcript):

*ARBITRATOR REICHERT: Before the witness leaves, the tribunal has some questions. Could the IDA Schedule C, which is page 20 of the PDF, please be put up on the screen. Could that be blown up, please. Sir, you were brought to the Ringi and -- first, am I correct in saying that you personally wrote the Ringi, is that correct?*

*THE WITNESS: That's correct.*

*ARBITRATOR REICHERT: As part of the preparation of the Ringi, did you have the full text of the IDA available to you prior to its being signed?*

*THE WITNESS: I had what was the final version as of that time.*

*ARBITRATOR REICHERT: In the Ringi, in relation to Schedule C, you wrote, No commitment in and after third year. Do you remember that?*

*THE WITNESS: Yes.*

*ARBITRATOR REICHERT: Now, we are going to look at Schedule C. And we see the annual minimum purchase here for contract years one and two clearly set out, and then we see the annual minimum purchase for each subsequent contract year shall be agreed to in writing by the parties 90 days prior to the end of the then current contract year. The next sentence is the one that I would like you to give particular consideration to please. In the event the parties have not mutually agreed on the annual minimum purchase for any contract year, the annual minimum purchase for such contract year will be the same as the prior contract year. Now, it is the Claimant's position in this arbitration that that language means that in the event that negotiations, and these negotiations are defined elsewhere as in good faith, that if they have not come to fruition, the prior contract year becomes the annual minimum purchase. Is that your*

*understanding of how this contract language works when you read it for the purposes of the Ringi?*

*THE WITNESS: That is my understanding.*

*ARBITRATOR REICHERT: And assume for hypothetical purposes that there were good faith negotiations but they did not lead to an agreement for a subsequent contract year, would it not then be the case that the annual minimum purchase appears to be the obligation of Nipro for that contract year?*

*THE WITNESS: My understanding is that there would not be an obligation. The minimum volume would be established as the previous year's volume but there would be no obligation relative to that.*

*ARBITRATOR REICHERT: So your understanding and your reading of this clause is that even if an Annual Minimum Purchase, with the capital letters, was established either by negotiation or in the event that the negotiations did not lead to an agreement, that there was no commitment or obligation on the part of Nipro to buy that Annual Minimum Purchase?*

*THE WITNESS: Yes, that's correct.*

39.   On its careful review of the foregoing matters in particular, and the evidential record generally, the Tribunal has considerable difficulty in accepting the Respondent's position. While there is evidence that the Respondent may have misunderstood the Agreement as a result of a mistake it made in preparing the Ringi, New York law requires contracts to be interpreted objectively.  An objective interpretation of the Agreement does not excuse the Respondent from performing its obligations after Year Two where the parties fail to reach a good faith agreement on modifying purchase quantities in future years.  Rather, the Agreement permits the parties to engage in good faith modifications, but, failing agreement, Respondent remains bound to purchase the pre-determined quantities for Years Three through Five.

40.   First, the Ringi is irreconcilable with the text of the Agreement (Schedule C). No person reading Schedule C of the Agreement could possibly extrapolate the phrase "no commitment in and after 3rd year" from the following, unambiguous (and so found in the First Award) language:

*The Annual Minimum Purchase for each subsequent Contract Year shall be as agreed to in writing by the parties ninety (90) days prior to the end of the then current Contract Year. In the event the Parties have not mutually agreed on the Annual Minimum Purchase for any Contract Year, the Annual Minimum Purchase for such Contract Year will be the same as the prior Contract Year.*

Where there is an irreconcilable conflict between the Agreement and a preparatory internal (to one side only as the Ringi was solely prepared for the purposes of the Respondent) document, as a matter of New York law, the Agreement controls the obligations between the parties. This is particularly the case where the Agreement has a detailed entire agreement or integration clause (Article XII as recorded already above).

41.   Secondly, the Tribunal finds that the email from Mr Verner (para. 33 above) in which he uses a particular phrase ("no penalty") was not reasonably relied upon to prepare the Ringi, rather than the actual text of the Agreement. Based on the evidence presented, the Tribunal concludes that in the Ringi process precision is deeply attached, with even the most minute level of detail thoroughly considered.  The Tribunal accordingly is not persuaded that the preparation of the Ringi at hand relied, not on the actual contractual language, but an entirely separate email itself expressed in terse terms.

42.   Thirdly, as discussed at paras. 23-27 of the Partial Final Award, the Parties provided for a specific "Purchase Shortfall" mechanism for Contract Years One-Two, which, on the Claimant's view (Terms of Reference, p. 15) was a penalty, of sorts. The Parties did not include such a mechanism for subsequent Contract Years, so, there was "no penalty" (in the sense of the "Purchase Shortfall") after the completion of Contract Years One-Two. The Tribunal, for completeness, recalls now those paragraphs of the Partial Final Award:

"23. The Tribunal considers it useful at this stage to note certain aspects of the Parties' relationship as set out in the Agreement which have passed into history. In particular, section 3.2 of the Agreement provides as follows (in relevant part):

> *If at the end of each of the first two (2) Contract Years, [Respondent]
> has failed to purchase at least the applicable Annual Minimum
> Purchase for such Contract Year, ... then the "Purchase Shortfall" for
> such Contract Year shall mean the quantities of applicable Products by
> which the Annual Minimum Purchase for such Contract Year exceeds
> the quantities of the applicable Products annually purchased by
> [Respondent] for such Contract Year. Subject to Article VI, in the event
> of a Purchase Shortfall in the first two (2) Contract Years, [Respondent]
> shall, without demand from [Claimant] and within thirty (30) days
> following the end of the applicable Contract Year, at [Respondent's]
> option either: (x) purchase quantities of the applicable Products equal
> to the Purchase Shortfall; or (y) pay an amount to [Claimant] equal to
> the Purchase Shortfall multiplied by the applicable prices for the
> Products as set forth on Schedule A ...*

24. The language quoted just above is clear in that the defined concept of
"Purchase Shortfall", and the consequence of such, is confined to the first two
Contract Years. However, the Parties have characterized "Purchase Shortfall"
in various ways, such as: (a) "[T]he parties agreed to an enhanced penalty
provision for Contract Years One and Two" (the Claimant in the ToR, p. 15);
or (b) "Purchase Shortfall Damages" (the Respondent in R 8/30 Subs, section
II. A). These characterizations are apt to mislead as section 3.2 does what it
does, and it neither refers to a penalty, nor to damages.

25. Section 3.2 of the Agreement articulates precise circumstances which, if
arising in either of the first two Contract Years, would trigger a contractual
obligation on the part of the Respondent. Such an obligation, if it arose, could
be satisfied in one of two ways at the Respondent's option. At no stage, as a
matter of the plain meaning of the words of this section, does one see a remedy
for a "breach" being articulated. If the Respondent did not purchase the
applicable Annual Minimum Purchase for either of the first two Contract Years,
that fact alone did not put it in breach; rather, a contractual obligation would
arise, which the Respondent could satisfy in one of two ways, at its option.

Damages or a penalty as recompense for a breach is not contemplated by the mechanics of section 3.2 of the Agreement.

26. The trigger contained within section 3.2 for an obligation on the part of the Respondent to do certain things in the event of a Purchase Shortfall, is, as already noted, unambiguously confined to the first two Contract Years. Those Contract Years are now over, and, therefore, it must follow that the specific trigger contained therein for an obligation on the part of the Respondent to *(x) purchase quantities of the applicable Products equal to the Purchase Shortfall; or (y) pay an amount to [Claimant] equal to the Purchase Shortfall multiplied by the applicable prices for the Products as set forth on Schedule A* is spent. It is in the past, and the Agreement has, to that limited and precise extent, run its course.

27. The Tribunal considers it to be of assistance to the Parties to offer this guidance so that insofar as they hereinafter pursue matters in this case, there is clarity that the obligation which might have arisen on the part of the Respondent pursuant to section 3.2 of the Agreement (in the event of a defined occurrence of a "Purchase Shortfall") during the first two Contract Years no longer arises. Also, for reasons which are set out below, the Tribunal considers it appropriate and necessary to precisely articulate and understand what section 3.2 of the Agreement actually does, and, importantly, does not do."

43. Fourthly, the entire premise, particularly as articulated by Mr Minoura in his testimony (as recorded just above), that even in the event of good faith negotiations (whether leading to an agreed amount for any of Contract Years Three-Five, or triggering the fall-back of the prior year's amount), no obligation arose on the part of the Respondent, does not accord with an objective reading to the contract, as required under New York law. The Claimant would, on the Respondent's theory, be left with only one avenue and that would be to terminate the Agreement. However, that would be, on the Respondent's

theory, of no benefit to the Claimant as it would not give rise to any compellable right on its behalf to further sales to the Respondent. In the context of a contract of a five-year duration, an objective interpretation of the contract does not support the conclusion that once one was past the first two years, performance on the part of the Respondent as regards purchases become, effectively, optional.

44.    In summary, the Tribunal concludes that an objective reading of the Agreement does not permit Respondent to terminate its commitments under the Agreement after the first two Contract Years. As best as it can ascertain from the evidence before the Tribunal, the Ringi was undermined by a fatal mistake in its preparation (which conclusion arises from the matters discussed at paras. 37 and 38 above).  Thus, while the Tribunal accepts that the Ringi was a *bona fide* source of mistake as to the consequences of the Agreement for persons within the Respondent, that mistake was caused not by Mr Verner, or Sinocare, but those who prepared that document. In any event, the Tribunal mentions in passing that the Respondent's execution of the Agreement is not made subject to the Ringi.  As a matter of New York law, Respondent is bound by an objective interpretation of the Agreement, and is not excused from its obligations under the Agreement by a subjective mistake it may have made arising from the Ringi when it entered into the Agreement.

45.    However, the case advanced by the Respondent to adjust the Agreement does have to be looked in the light of two further matters, namely: (a) a dialogue with the Tribunal during the course of opening statements at the hearing; and (b) the Respondent's post-hearing written brief.

46.    At the outset of the hearing (pp. 59-61 of the transcript), the following dialogue occurred as between Counsel for the Respondent and the Tribunal:

> *ARBITRATOR REICHERT: Just before you go on, just for the purposes of a dialogue between us, if hypothetically speaking there had been good faith negotiations, whatever that might mean, and they hadn't come to a particular conclusion by the end of that calendar 3 year, what would have been the position in your case.*
>
> *MR. TILLINGHAST: If there had in fact been good faith negotiations.*

> *ARBITRATOR REICHERT: If there had been.*
>
> *MR. TILLINGHAST: The way we interpret the contract is the good faith would lead to an agreement.*
>
> *ARBITRATOR REICHERT: But assuming that not.*
>
> *MR. TILLINGHAST: Then it would defer back to the prior year.*
>
> *ARBITRATOR REICHERT: But the requirement is good faith negotiations.*
>
> *MR. TILLINGHAST: Yes. And as we submitted in our papers, **the concept of a good faith negotiation should be taken in the context of what a Japanese company would expect. There is an expectation that those negotiations would be wholesome, fulsome and they would include market conditions**. Market conditions at this point were Trividia's products were on the decline. And not due to anything that Nipro did.*

47. In the Respondent's post-hearing written brief, the following (amongst others) is stated in answer to the fourth of the Tribunal's questions (recorded above at para. 3(w)):

> *26. The answer to this question requires consideration of three preliminary questions: (a) whether the IDA requires the parties to negotiate an AMP amount beginning in Year Three; (b) whether the parties must negotiate in good faith; and (c) whether good faith negotiations constitute a condition precedent for application of the IDA's prior year fallback provision. Because the answer to all three of these questions is yes, Nipro asserts that it was not mistaken as to the effect of Clause 2.2 and Schedule C to the IDA.*
>
> *…………………*
>
> *42. Trividia asserts that "nothing in the language of the IDA suggests that good-faith negotiations are a 'condition precedent' to invoking these carryover minimums." TSOR ¶ 89. Quite the contrary, a review of Clause 2.2 and Schedule C confirms the parties had to negotiate in good faith toward an agreement, and those negotiations had to fail before the provision setting Year Three's AMP at the same number as Year Two could take effect – a "fallback" amount.*
>
> *………*
>
> *53. The IDA prescribes a logical sequence of events and consequences: the parties were to engage in good faith efforts to reach a mutual agreement, and "in the event" those efforts failed, then, and only then, would the fallback to*

*the Year Two amount take effect. Since no reasonable person would allow another party to pursue trickery, deceit, logical impossibilities, or other bad faith conduct in meeting their contractual obligations, and no honest person would accept such terms, it would be unconscionable to impute such terms to Clause 2.2 and Schedule C, or to enforce the consequences of such a reading against Nipro.*

*54. Accordingly, if the Tribunal were to find that Nipro was mistaken as to the operation of Clause 2.2 and Schedule C of the IDA, those provisions would render negotiations after Year Two optional and permit bad faith negotiations, and allow Trividia to benefit from its own bad faith conduct, and as such would be rescinded and/or unenforceable.*

48.   The Tribunal has spent considerable time in deliberations taking the foregoing oral and written submissions in account. The Respondent appears to be suggesting that the Agreement should not be adjusted at all, but followed according to its terms (as it says the terms should be interpreted): *(a) whether the IDA requires the parties to negotiate an AMP amount beginning in Year Three* [the Respondent's answer is yes]*; (b) whether the parties must negotiate in good faith* [the Respondent's answer is yes]*; and (c) whether good faith negotiations constitute a condition precedent for application of the IDA's prior year fallback provision* [the Respondent's answer is yes]. What is unclear is whether these positions cut across the explicit testimony of the Respondent's own witness, Mr Minoura, to the Tribunal as recorded above (para. 37). These positions certainly appear to do so as they indicate that in the event of good faith negotiations which do not come to fruition, the prior year fallback is engaged. As discussed above, the Tribunal understood the Respondent's position to be at the hearing from its witness in particular that even that scenario would not give rise to the prior year fallback in the sense of a binding obligation. In any event, the Tribunal has already held, as a matter of law and fact, that the Respondent had no basis (apart from a flawed Ringi, which was its own fault) to hold such a view.

49.   The formulation of the Respondent's three questions and answers (see just above) leads the Tribunal to consider the Claimant's view in relation to the interpretation of clause 2.2

and Schedule C of the Agreement. This is encapsulated at paras. 89-91 of the Claimant's
Statement of Reply:

> 89. Nothing in the language of the IDA suggests that good-faith negotiations
> are a "condition precedent" to invoking these carryover minimums. New York
> law requires that a condition precedent be clearly identified in a contract's
> language. See, e.g., Tyndall v. Tyndall, 42 N.Y.S.3d 250, 251-52 (N.Y. App. Div.
> 2016) (CLA-488) ("A contractual duty ordinarily will not be construed as a
> condition precedent absent clear language showing that the parties intended to
> make it a condition." (citation omitted)); id.("It must clearly appear from the
> agreement itself that the parties intended a provision to operate as a condition
> precedent. If the language is in any way ambiguous, the law does not favor a
> construction which creates a condition precedent."(internal quotation marks
> and citations omitted)). The IDA contains no such "clear language" making
> good-faith negotiations a condition precedent. In fact, the language used in
> Section 2.2—"provided, however"—demonstrates the opposite proposition,
> expressly modifying the annual negotiation requirement to preserve a minimum
> carried over each year of the contract independent of the parties' reaching an
> agreement on a new minimum. Tellingly, Nipro conspicuously omits these two
> words when quoting Section 2.2 in its brief. See CSOD ¶¶ 100-101. Carrying
> over the prior year's minimum is not contingent on good-faith negotiations; it
> is a contingency in the event no such negotiations take place or no agreement
> is reached.

> 90.Moreover, Nipro cannot redefine "good faith" to require Trividia to
> negotiate below the minimums it is guaranteed in each year of the contract.
> While Trividia did, in fact, negotiate in good faith with Nipro, good faith did
> not require Trividia to abandon its own economic self interest.See Gas Nat.,33
> F. Supp. 3d at 382 (CLA-377) (acting in self-interest is not bad faith).Trividia
> was under no duty to accept or even counter Nipro's absurdly low offer to
> purchase 27 million strips—a decrease of 153 million strips from the minimum
> guaranteed to Trividia in the IDA. But it did make a counter offer, and Nipro
> rejected Trividia's generous good faith offer.

> 91.Nipro agreed to a contract that obligated it to purchase at least 180 million
> strips in Year Three (as well as Years Four and Five). Nipro failed to do so,
> and thus breached its obligations under the IDA. That Nipro, a sophisticated
> international corporation, may now regret the agreement it executed, has no
> bearing on whether it is required to live up to its contractual obligations.

50.   The Tribunal does not agree with the Claimant's submission in this regard. First, the
      Claimant overstates, considerably, the position with phrases such as "minimums it [was]

guaranteed in each year of the contract". The Tribunal discerns no such guarantees, nor is there any language which is objectively capable of bearing such a meaning. Secondly, the Claimant engages in overstatement again when it suggests that the Respondent "*agreed to a contract that obligated it to purchase at least 180 million strips in Year Three*". Again, the Tribunal discerns no such obligation, at least in the conclusory and stark terms asserted by the Claimant.

51.   The position is more nuanced. The Agreement mandates, by the use of the word "shall", good faith efforts to mutually agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year. Those good faith efforts are triggered by the following circumstance: "*in the event that the parties have not agreed on the Annual Minimum Purchase for the next Contract Year during the initial or any renewal term.*" The Agreement could not be clearer, the Parties must make those good faith efforts if they have not agreed on the relevant Annual Minimum Purchase.

52.   The good faith efforts are not left open-ended by the Agreement and they are circumscribed as follows: "*provided, however, that in the event the parties are unable to agree on the Annual Minimum Purchase for the next Contract Year prior to the end of the then current Contract Year, then the Annual Minimum Purchase for the next Contract Year shall be the same as that of the then current Contract Year.*" The Tribunal does not agree with the Claimant that the words "provided, however" operate so as to modify the good faith efforts by preserving "a minimum carried over each year of the contract independent of the parties' reaching an agreement on a new minimum". The phrase "provided, however" does no such thing, and the Agreement operates to place a temporal cut-off for the good faith efforts in order to give clarity to the Parties as to their obligations for a particular Contract Year.

53.   The Tribunal, thus, interprets clause 2.2 as imposing a mandatory requirement on the Parties to use good faith efforts in the run-up to a new Contract Year. Whether that is described in substance as a condition precedent is, in the Tribunal's view, neither here nor there. Rather, the Parties entered into a precise set of obligations as regards their

conduct in the run-up to a new Contract Year, and the Tribunal, in substance, agrees with the Respondent's three questions and answers (see para. 47) as to the functioning of clause 2.2 and Schedule C. In those circumstances, bearing in mind para. 54 of the Respondent's post-hearing brief, its apparently alternative case that the Agreement is to be rescinded or declared unenforceable falls away.

54. By way of completeness, the Tribunal does not agree with the Respondent's oral submissions (para. 46 above) that the good faith efforts should be as follows:

> *the concept of a good faith negotiation should be taken in the context of what a Japanese company would expect. There is an expectation that those negotiations would be wholesome, fulsome and they would include market conditions.*

This proposition finds no support whatsoever in the text of the Agreement, and would, in effect, place the Claimant in a position of subservience to Japanese business expectations. The Agreement is subject to New York law. New York law requires an objective interpretation of "good faith" that accounts for the reasonable mutual expectations of both parties, and not just the expectation of the Respondent.

55. To conclude on the overall issue of putative adjustment to the Agreement, the Tribunal finds no case made out by the Respondent to change the terms of that contract. In fact, the Respondent's final say on the matter makes it clear that it actually wants the Agreement unchanged, and followed to the letter. The Tribunal also, insofar as is necessary (and based on the foregoing analysis, it is not necessary), concludes that the factual record of this arbitration, having reviewed it in detail and over some time, does not rise to the level required by the governing law (New York law) for reformation or rescission (whether partial or otherwise). Thus, the question posed by the Tribunal at para. 25 (a) above is answered: the Agreement is not adjusted or changed.

*Did the Parties engage in good faith efforts (as a matter of clause 2.2 of the Agreement) to mutually agree on the Annual Minimum Purchase for Contract Year 3?*

56.   By way of introduction to this part of the Final Award, the Tribunal, for ease of reference, recalls two of the questions it asked of the Parties following the hearing:

> *Q.1: What exactly is meant, by reference to New York law, by the phrase "the parties shall use good faith efforts to mutually agree" in clause 2.2 of the IDA? The Tribunal requests the parties to exercise a high degree of discrimination when it comes to citation so that we are only directed to cases (either on the record, or if absolutely necessary, not yet on the record) which are of direct assistance and not simply illustrative of what other contractual language in other contexts might have said.*
>
> *Q.2: By specific reference to the evidence on the record of this case, what were, or were not, the "good faith efforts to mutually agree" on the part of the Claimant leading up to the commencement of Contract Year 3, and were those efforts undertaken in good faith, or not, by reference to the answer given to Q.1.*

57.   The Tribunal considers that discussing the answers to these two questions are the appropriate sequence of reasoning for the purposes of this section of the Final Award. The explanation for the Tribunal's sequencing of the questions does not require lengthy elaboration as it is a logical necessity that before one decides the outcome to the question of whether there were "good faith efforts", one should examine what that standard might actually mean as a matter of New York law (as New York law governs the Agreement). Once one understands what the phrase means legally according to the governing law, then it becomes possible to measure what actually transpired between the Parties against that standard.

58.   The Parties are on common ground as regards this question. In the Respondent's post-hearing brief (para. 3) and in the Claimant's post-hearing reply brief (para. 1), they both invoke the same New York case, namely, *L-7 Designs, Inc. v. Old Navy, LLC*, 964 F. Supp. 2d 299, 307 (S.D.N.Y. 2013) (RLA-339). The Tribunal will now examine that case in some detail.

59. First, the contractual language which was at the center of that case read as follows:

> Section 5 of the SOW was entitled "Todd Oldham Branded Line," and it provided as follows: a. In September 2007, the parties will announce publicly that Todd Oldham/[L-7] shall be serving as Design Creative Director of Old Navy and that it is the intent of the parties to develop and launch a line of products that will bear TODD OLDHAM Marks to be sold exclusively at Old Navy stores at a future time. b. [L-7] and Old Navy acknowledge and agree that the specific terms and conditions related to this proposed line of products bearing TODD OLDHAM Marks are to be negotiated and agreed upon by the parties in a separate agreement. The parties plan to enter into a separate agreement related to these products by October 1, 2008. c. The parties agree that this separate agreement will contain at least the following: (1) royalty fees paid to [L-7] of 5% of Old Navy's retail sales for this particular line only (not all Old Navy products) and (2) agreement and final approval by both Old Navy and [L-7] as to the collections and products to be sold by Old Navy.

> By these provisions, the parties entered into a binding preliminary agreement, that is, "a mutual commitment to negotiate together in good faith in an effort to reach final agreement." L-7 Designs II, 647 F.3d at 430 (quoting Teachers **\*304** Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F.Supp. 491, 498 (S.D.N.Y.1987)).

60. Between April 2008 and February 2009 those parties engaged in a great deal of back and forth in negotiations. Those did not come to fruition. Ultimately, following an appeal to the Court of Appeals, the matter came before the Southern District of New York by way of summary judgment application (the judgment upon that application is RLA-339) and the following legal test is articulated (while the quotation is lengthy, the subject-matter is of importance to this arbitration):

> B. Failure To Negotiate in Good Faith

> As the Second Circuit noted, section 5 of the SOW created a binding preliminary agreement to negotiate the license agreement in good faith. See L-7 Designs II, 64 7 F.3d at 430. The parties agree, however, that Old Navy could abandon the deal as long as it first made a good faith effort to reach an agreement. ………… L-7 contends that Old Navy breached the CSA and SOW "by failing to negotiate in good faith." …….. Old Navy moves for summary judgment on this claim. For the reasons described below, with respect to the failure to negotiate claim, I grant Old Navy's motion for summary judgment.

*1. Applicable Law*

*Under New York law, "a binding preliminary agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F.Supp. 491,498 (S.D.N.Y.1987). With this sort of agreement, "the parties are bound only to make a good faith effort to negotiate and agree upon the open terms and a final agreement if they fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation." Adjustrite Sys., Inc. v: GAB Bus. Servs., Inc., 145 F.3d 543,548 (2d Cir.1998). It is possible, then, that no contract will be finalized if, for example, the parties encounter "good faith differences in the negotiation of the open issues" or "lose interest as circumstances change." Tribune Co., 670 F.Supp. at 498.*

*In the context of the obligation to negotiate in good faith pursuant to a preliminary binding agreement, the parameters of what constitutes good faith, or bad faith, are not clearly delineated. See l Arthur Linton Corbin, On Contracts § 2.8 (rev. ed. l993). Some generalizations, however, can be drawn. First, at the very least, good faith requires "honesty in fact." 6 id. § 26.8; cf A.I. Trade Finance, Inc. v. Laminaciones de Lesaca, S.A., 41 F.3d 830, 837 (2d Cir.1994) (citing UCC, as adopted by New York). Negotiations conducted in good faith encompass an "honest[ ] articulation of interests, positions, or understandings." Penguin Ci-rp. (USA) Inc. v. Steinbeck, No. 06 Civ. 2438(GBD), 2009 WL 857466, at \*2 (S.D.N.Y. Mar. 31, 2009); see also TVT Recorrl~- 1·. Island De/Jam Afusic Grp., 244 F.Supp.2d 263, 277 (S.D.N.Y.2003) ( "'The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract.' " (quoting Cross & Cross Props., Ltd. v Everett Allied Co., 886 F.2d 497, 502 (2d Cir.1989) (describing covenant of good faith and fair dealing))).*

*Second, the duty to negotiate in good faith obligates a party only to try to reach an agreement: a party does not act in bad faith merely because, in the end, it refuses to capitulate to the other side's demands. See Steinbeck, 2009 WL 857466, at \*2; 6 Corbin, supra, § 26.8 (citing Robert S. Summers, " 'Good Faith' in General Contract Law and the Sales Provisions of the Uniform Commercial Code," 54 Va. L.Rev. 195, 202-03 (1968)); cf Zilg v. PrenticeHall, Inc., 717 F.2d 671. 681 (2d Cir.1983) (with respect to duty to promote in good faith, finding of bad faith is inappropriate "unless the plaintiff proves that the motivation underlying those decisions was not a good faith business judgment").*

*Third, "[s]elf-interest is not bad faith." Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275. 279 (7th Cir.1996). Acting in one's financial self-interest, for example, in response to market changes, does not constitute bad faith. Id.*

*Fourth, bad faith requires some "deliberate misconduct"-arbitrary or capricious action taken out of spite or ill will or to back out of an otherwise binding contractual commitment. See Venture Assocs. 96 F.3d at 279. For example, a party acts in bad faith if it" 'renounce[s] the deal, abandon[s] the negotiations, or insist[s] on conditions that do not conform to the preliminary agreement.' " L-7 Designs 11, 647 F.3d at 430 (quoting Tribune Co., 670 F.Supp. at 498). Thus, "trying to scuttle the deal" or to take advantage of expenditures made by the other side to advance the project may constitute bad faith, depending on the circumstances. See Venture Assocs . 96 F.3d at 279-80 (raising price for asset sale to induce opposing party to reject deal distinguished from merely raising price in light of asset's increased market value), cited with favor in L-7 Designs 11, 647 F.3d at 433. See generally E. Allan Farnsworth, "Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations," 87 Col um. L.Rev. 217, 273-85 (1987) (describing instances of unfair dealing during negotiation process by drawing comparisons to other bodies of law).*

*In the end, however, "[a] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." Tribune Co., 670 F.Supp. at 497. Where negotiations fail for bona fide business reasons, the duty to negotiate in good faith should not operate to elevate a binding preliminary agreement into a full blown contract. See Venture Assocs., 96 F.3d at 28] (Cudahy, concurring) (acknowledging "paradox" of "foist[ing] the peculiar and special consequences of an agreement on parties who have not in fact agreed" in light of the "many perfectly legitimate reasons for negotiations to fail. even if good faith prevails").*

61. The Tribunal will now examine, by reference to New York law, as set out just above, the Parties' respective cases in answer to the second of the questions (recorded at para. 57 above), namely, what were the efforts to negotiate the quantity for Contract Year Three, and were they in good faith.

62. The Tribunal has already recorded (paras. 12-20 above) the contemporaneous correspondence passing between the Parties. As can be readily noted, the Parties were very far apart from one another in their positions which were, in summary as follows. The Respondent's first position was an 85% reduction on the Contract Year Two amount. The Claimant countered with a 5.5% reduction on the Contract Year Two amount. The Respondent then expressed a willingness to accept that counter offer but with an important caveat, namely, that there would be no obligation on its part in

respect of any shortfall of purchase amount. In essence, this was the position which the Respondent has pursued in this arbitration but as has been already found in the Partial Final Award, and above, is not reconcilable with its actual obligations.

63. The Respondent, at para. 11 of its post-hearing brief, sets out its position on why it opened with an 85% reduction on the Contract Year Two amount:

> On October 26, 2017, Iwasaki emailed Perez-Lopez and provided a good faith estimate for Nipro's product needs in Year Three (2018)—i.e., 27 million strips. R-042. By 2017, both Nipro Europe and Nipro Australia knew that Trividia would be selling its latest product, the TRUEMetrix Air, directly to Nipro's customers in those territories in 2018 (Year Three). RWS Rosseel, ¶ 13; RWS Supp. McMaugh, ¶¶ 20-22; R-213; R-222. Nipro also could not sell the same quantity as Year One because Trividia was now selling directly into markets such as Germany, the U.K. and Australia at lower prices than Nipro (RWS Supp. McMaugh, ¶¶ 20-23; RWS Rosseel, ¶¶ 11, 13; Tr. 943:13-944:18), and various competitor products had entered the market which tested a broader range of criteria and dramatically reduced Nipro's ability to sell the older products Trividia sold to Nipro. RWS Supp. Rosseel, ¶ 15; Tr. 1138:6-1139:8. Consequently, the TRUE line of products were no longer a viable option for Nipro Europe and Nipro Australia, RWS Supp. McMaugh, ¶¶ 20-25; RWS Supp. Rosseel, ¶¶ 11-13, and Nipro's estimate of 27 million strips factored in this market reality. See Tr. 871:17-872:6; 940:8-2.

> There was a footnote to this passage as follows:

> Nipro's estimated Year Three AMP quantity was also reduced because Nipro had excess inventory of 40-50 million strips from a large order it placed at the end of Year Two to meet the AMP quantity. Tr. 873:2-18; 874:20-875: 9.

64. The Respondent, at paras. 13-24 of its post-hearing brief, sets out the gravamen of its position on the negotiations, namely, that, unbeknownst to it, the Claimant had a nefarious agenda to string these out but never intending to come to an agreement (para. 24 thereof):

> Trividia attempted to "leverage" the negotiations with Nipro, rather than engage in honest and meaningful discussions to try to reach agreement. Trividia wanted the Year Two minimum to automatically apply to Year Three regardless of Nipro's actual business needs, so it ensured no agreement would be reached.

65.  The Respondent relies, heavily, on a set of hand-written notes of Dean Sorrentino (of the Claimant) (R-266) which it says shows a strategy laid out by him from November 2017 through to January 2018 to end up with no agreement.

66. The Tribunal sees that this argument of the Respondent is important in light of the content of New York law as set out above. As the Tribunal understands New York law, there must be an element of bad faith, dishonesty, or however else one might describe conduct which is directed towards illegitimately scuttling a deal. On their face, the contemporaneous back and forth between the Parties (paras. 12-20 above) are not remarkable insofar as the New York law requirements are concerned, save that the Tribunal can see that the Respondent was negotiating on a flawed premise, namely that it thought that it had no obligation to actually buy the full amount of the Contract Year Three amount, however that amount might have been arisen. As discussed earlier in this Final Award (paras. 26-55), that was a premise which was of its own making and had no contractual or legal basis. Thus, the key question for the Tribunal to resolve is whether there is substance to the Respondent's allegation that the Claimant had such a secret plan in late 2017. The Claimant denies (para. 9 of its reply post-hearing submissions) this and says, simply, that the hand-written notes of Dean Sorrentino track the provisions of the Agreement.

67. The Tribunal, having reviewed the hand-written notes, does not see anything remarkable about them, much less evidence of a nefarious plan on the Claimant's part to scuttle or skew, illegitimately, the negotiations in its favor. The Tribunal agrees with the Claimant that they are nothing more than a simplified strategy based on the terms of the Agreement.

68. The Tribunals notes, for completeness, that the Respondent also argues that "*Trividia's offer failed to take into account Nipro's actual business needs or Trividia's competitive sales efforts*" (para. 17 of the Respondent post-hearing brief). This is a submission

which cannot, on its face, succeed as New York law, as elaborated above, expressly allows self-interest in negotiations.

69. The Tribunal, therefore, in light of the foregoing and having considered the arguments of the Respondent in particular, finds that there was no plan on the part of the Claimant to scuttle the negotiations. In fact, what appears to the Tribunal as the matter which scuttled the negotiations was the Respondent's insistence on a flawed premise as regards its contractual obligations. As long as the Respondent thought that it had no obligation to buy the full amount of the Contract Year Three amount, then there was little prospect of negotiations coming to fruition. The important conclusion is that the Tribunal is satisfied (having reviewed at length and considered in detail the contemporaneous correspondence passing between the Parties recorded at paras. 12-20 above) that there were good faith efforts, consistent with New York law, in respect of the Contract Year Three amount. Those negotiations did not come to a successful conclusion, and, as a matter of Schedule C to the Agreement, the default position then applied, namely, that the Contract Year Two amount become the Annual Minimum Purchase for 2018.

70. In conclusion, the question which the Tribunal posed itself at para. 25(b) above is answered; good faith efforts were made to negotiation the Contract Year Three amount. Those efforts did not come to a conclusion, and, thus, as a matter of Schedule C to the Agreement, the Contract Year Two amount became the Annual Minimum Purchase amount for 2018.

*Was the termination of the Agreement asserted by the Claimant in March 2019 was legally sound? Consequences?*

71. The Tribunal now moves to the third question it posed itself in para. 24 above, namely, whether or not the termination of the Agreement asserted by the Claimant in March 2019 was legally sound.

72. As recorded already (para. 21 above), in January 2019 the Claimant put the Respondent on notice of a number of alleged breaches of the Agreement. This ultimately led to the termination of the Agreement in March 2019 (para. 3(k)-(l) above). The Tribunal, in its questions to the Parties for the purposes of their post-hearing briefs (recorded at para. 3(w) above), specifically enquired: *(a) do the matters each come within "any breach of this Agreement" as per clause 2.4(iii) of the IDA; and (b) were each cured by the Respondent within 30 days to the extent required so as to preclude the right of the Claimant to terminate as per the introductory language of clause 2.4 of the IDA.*

73. The Respondent summarizes the introduction to its answers to these questions in its post-hearing brief as follows (para. 55):

> *Trividia's January 16, 2019 letter to Nipro (the "Breach Notice") lists the following matters it has complained to the Tribunal about as being alleged breaches of the IDA: (a) Nipro's alleged failure to satisfy the AMP amount for Year Three; (b) Nipro's alleged failure to provide forecasts for Year Four; and (c) specific alleged violations of the trademark provisions of the IDA, namely (i) the FAQ section of Nipro Australia's website, (ii) Nipro Australia's letter to its product users list ("Nipro Australia's List"), dated November 28, 2018, and (3) dissemination of a flyer created by Nipro U.K. containing the TRUE mark. C-065.*

74. In light of the conclusions set out above, the Respondent did indeed fail to satisfy the Annual Minimum Purchase for 2018 for the following reasons. The good faith efforts did not result in an agreed amount for Contract Year Three (2018), and as a matter of Schedule C to the Agreement, the default position then was engaged. The Annual Minimum Purchase obligation on the part of the Respondent was, therefore, the same

as Contract Year Two (2017). The Respondent, wrongly, did not accept that fact and pursued, in this arbitration, arguments as to interpretation, and then adjustment (in its general sense) of the Agreement, neither of which have been resolved in its favor. Further, the Respondent has alleged that the Claimant had a nefarious or secret plan to scuttle the good faith efforts which were the predicate for the engagement of the default position under Schedule C to the Agreement. That argument also did not prevail. Thus, the inevitable and logical conclusion of all of the foregoing was that the Respondent was obliged, as a matter of the Agreement, to purchase, in 2018, 3,600,000 vials of strips (which was the Contract Year Two amount, transposed then into Contract Year Three).  The Respondent did not purchase that number of vials in 2018.

75. The Respondent's post-hearing brief sets out its position in relation to this particular asserted (by the Claimant) breach of the Agreement as follows:

> 79. Nipro's alleged failure to satisfy the AMP with respect to Year Three does not constitute a "breach of this Agreement" under Clause 2.4(ii). First, Nipro's alleged failure to purchase the AMP amount in Year Three does not constitute a violation of the IDA, because the IDA does not require Nipro to purchase any particular amount of products beyond Year Two. See CSOR ¶ 280. A party cannot breach a contract by failing to fulfill a requirement that does not exist. Gianelli v. RE/MAX of New York, Inc., 41 N.Y.S.3d 273, 274 (2d Dep't 2016) ("A breach of contract cause of action fails as a matter of law in the absence of any showing that a specific provision of the contract was breached.") (RLA-454); Knopf v. Sanford, 1 N.Y.S.3d 18, 20 (1st Dep't 2014) (dismissing breach of contract counterclaim where plaintiffs followed explicit terms of the agreement) (RLA-455).
>
> 80. Moreover, any unfulfilled requirement to purchase a certain amount of "Product" in Year Three was excused by: (a) Trividia's breach of the IDA by failing to negotiate in good faith; (b) Trividia's frustration of Nipro's performance in the U.K., Europe, and Australia; and (c) the IDA's broad force majeure clause.

76. The Tribunal readily sees, without the need to refer to the Claimant's position, that at least two of these positions of the Respondent cannot survive the findings set out earlier in this Final Award. In particular: (a) the position that "*the IDA does not require Nipro*

*to purchase any particular amount of products beyond Year Two*" has been denied by the Tribunal; and (b) "*failing to negotiate in good faith*", has been denied by the Tribunal. Thus, two positions remain, namely, the allegation of frustration of the Respondent's performance in the UK, Europe and Australia, and, force majeure.

77. As regards the first of these remaining positions, namely, frustration, the Respondent puts the predicate for case in its post-hearing brief (para. 86) as follows:

> *Refusing to permit Nipro to register the TRUEMetrix Air strips in Australia, especially in light of the fact that the meters it provided Nipro lacked Bluetooth, and the NDSS ceased reimbursing TRUEresult products in February 2019. RWS McMaugh, ¶¶ 13-14, 41; R-147; R-145; R-219; R-263; R-222; R-247; RWS 2d Supp. Iwasaki ¶ 23; RWS Supp. McMaugh, ¶ 28; Tr. 106:18-107:2, 111:20-112:23, 320:10-321:21, 356:16-22, 1139:9-1144:14, 1148:5-17.*

> *Refusing to permit Nipro to register the TRUEMetrix product range in Europe. RWS Rosseel, ¶ 13; R-213; Tr. 110:11-18.*

> *Establishing its own competing offices which sold the TRUEMetrix Air, the "latest technology," in these same territories at lower prices. R-148; R-240; R-241; R-242; R-225; R-222; R-221; R-246; R-247; R-248; R-249; R-250; R-251; R-252; R-254; R-255; R-256; R-257; R-261; R-262; R-265; R-264; RWS Supp. McMaugh, ¶¶ 19-25; RWS McMaugh, ¶¶ 33, 39; RWS Rosseel, ¶¶ 5, 13-15, 17-18; RWS Supp. Rosseel, ¶¶ 7, 11-12; Tr. 146:10-17.*

78. Next, the Respondent draws the following conclusions (para. 87 of its post-hearing brief):

> *In light of such conduct, as well as the fact that the products Trividia was selling Nipro were not its "latest" BGM products, R-254, Trividia could not reasonably expect Nipro to sell the same quantity in Year Three as in previous years. Trividia may not interfere with Nipro's ability to perform under the IDA, and then argue that the resulting reduced purchases breach the IDA. Hidden Meadows Dev Co. v. Parmelee's Forest Prod. Inc., 289 A.D.2d 642, 644, 734 N.Y.S. 2d 264 (3d Dep't 2001) (RLA-159).*

79. The Claimant (para. 23 of its reply post-hearing brief) submits that this is an attempt to find an excuse for the Respondent's failure to abide by the Agreement.

80. The Tribunal does not consider it necessary to agree with the Claimant's hypothesis, rather, the question which is of more pertinence is whether the Respondent's position finds support in the Agreement or as a matter of New York law. The Tribunal concludes that there is no such support, and, therefore, this argument cannot succeed. In particular, the Respondent cannot (in the Tribunal's view) point and does not point to any provision in the Agreement which might obligate the Claimant to permit the matters set out above at para 77. The Tribunal considers the Respondent's arguments to be, in effect, an attempt to subordinate the Claimant's business strategy in favor of its own absent any express obligation in the Agreement to do so. The Tribunal denies this position of the Respondent.

81. As regards the second of the Respondent's positions, namely, force majeure, it argues the following at paras. 88-89 of its post-hearing brief:

> *The IDA's force majeure clause is unique in that it explicitly excuses liability for nonperformance when caused by, among other things, "inability to obtain . . . material . . . or act of any government or agency thereof, or any cause whether similar or dissimilar to the [enumerated force majeure events] beyond the reasonable control of [the nonperforming party]." R-041, Art. VI, § 2.4(ii)*

> *As explained above, the "cause" of Nipro's inability to purchase a sum certain of products during Year Three was Trividia's conduct, which undoubtedly was beyond Nipro's reasonable control.*

82. The Claimant's position is the same as succinctly described above at para. 79.

83. The Tribunal disagrees with the Respondent and sees its argument in the same light as the frustration allegation, namely, one which does not find support in the Agreement. While there is indeed a force majeure clause, the Tribunal cannot see how it can operate (either by its own terms or through any mechanism which might be known to New York law) in the manner proposed by the Respondent to effectively denude the Claimant of its contractual rights even though none of the acts complained of form part of any obligation owed to the Respondent. Indeed, the Agreement expressly

contemplated that the Parties would be in competition with one another from Contract Year Three. That is obviously inimical to the Respondent's allegations set out above.

84. In conclusion, the Tribunal does not consider that the Respondent has established any reason to excuse its non-purchase of the Annual Minimum Purchase for 2018. Thus, it must therefore follow that section 2.4 of the Agreement is duly engaged ("***NDI shall have the right at any time** during the initial term or any renewal period hereof, by giving notice in writing to Distributor, **to terminate this Agreement forthwith** without judicial action **upon the occurrence of <u>any</u>** of the following events: (i) **Distributor's failure to purchase the applicable Annual Minimum Purchase during any Contract Year** as set for on Schedule C*") (emphasis added).

85. The Tribunal, therefore, finds and holds that the Claimant was entitled to terminate the Agreement in March 2019 as a matter of section 2.4 of the Agreement due to the established and unexcused fact that the Respondent failed to purchase the Annual Minimum Purchase applicable for 2018. The various other allegations (*e.g.* use by the Respondent of the Claimant's proprietary information marks and so on) also relied upon by the Claimant for the purposes of termination of the Agreement do not, therefore, need to be considered at this stage as the word "any" is used for the purposes of section 2.4 of the Agreement. Once one aspect of clause 2.4 of the Agreement is established, other alleged predicates for termination necessarily do not need to be considered. For the avoidance of doubt, the Tribunal will examine the other allegations of the Claimant concerning the Respondent's, *e.g.*, use of the marks, later in this Final Award in the context of its discussion of the question it posed at para. 25(d) above.

86. Turning now to the Claimant's claim for damages arising from the termination of the Agreement (being the consequence thereof), for the reasons set forth above the Tribunal has concluded that the sustainable basis for such claim relates to the Respondent's conceded failure to purchase the Annual Minimum Purchase amount as required by the Agreement in 2018 (Contract Year Three). As is discussed later in this Final Award, the Claimant has not provided any evidence that it actually lost any sales

as a result of the claimed misuse of its trademarks nor has it shown that it is not going to receive the full value of the five year Agreement it entered into in 2016. In addition, the Claimant's damages expert did not calculate any separate damages amount for the claimed failure by the Respondent to provide purchase forecasts in 2017 as set forth in the Agreement (Kindler Tr.659), so the Tribunal sees no need to decide whether such a breach was material.

87.  The Claimant initially sought so-called damages for Contract Years 3-5 of the Agreement (2018, 2019 and 2020) using a fairly straightforward methodology which is not substantively disputed by the Respondent. This was as follows. STEP 1: Compare the Annual Minimum Purchase requirement (3,600,000 for each year, as per the default position under Schedule C for the Annual Minimum Purchase calculation) with the actual amount of purchases (less permissible deductions as per the Agreement) for each year to determine the claimed shortfall amount. STEP 2: Determine the price per unit ($5.25) less applicable cost per unit to calculate the lost profit per unit. STEP 3: Multiply that amount by the claimed shortfall for each year.

88.  The purchase numbers are not largely in dispute. This arises from a comparison of the charts submitted by both the Respondent and the Claimant respectively as set forth just below:

**EXHIBIT A**

## Donohue Report Adjusted AMP Breach Claim

| Contract Year | Claimed AMP Requirement | Purchases | Claimed AMP Shortfall | Claimed Lost Profit per Strip | Claimed Discounted Lost Profits |
|---|---|---|---|---|---|
| 3 (2018) | 3,600,000 | 3,795,958 | 0 | $3.06 | $0 |
| 4 (2019) | 3,600,000 | 1,260,081 | 2,339,920 | $3.06 | $7,107,213 |
| 5 (2020) | 3,600,000 | 0 | 3,600,000 | $3.06 | $9,717,250 |
| | 10,800,000 | 5,056,039 | 5,939,920 | | $16,824,463 |

| Contract Year | | Purchases | Claimed Impacted Sales | Claimed Reduced Profits per Unit | Claimed Reduced Profitability |
|---|---|---|---|---|---|
| 3 (2018) | | 1,558,588 | 1,558,588 | $0.42 | $653,048 |

| Donohue Rebuttal Report Adjusted AMP Breach Claim | $ 17,477,511 |
|---|---|

Donohue Rebuttal Report, Table 21, Exhibits 6.0, 6.3

(assumes IDA Amendment 2 POs apply to Contract Year 3)

12

# Kindler Adjustment to Donohue Slide 12

| Contract Year | Claimed AMP Requirement | Purchases | Claimed AMP Shortfall | Kindler Adjusted Lost Profit per Strip | Kindler Adjusted Lost Profits |
|---|---|---|---|---|---|
| 3 (2018) | 3,600,000 | 3,795,958 | 0 | $3.40 | $0 |
| 4 (2019) | 3,600,000 | 1,260,081 | 2,339,920 | $3.40 | $7,896,694 |
| 5 (2020) | 3,600,000 | 0 | 3,600,000 | $3.40 | $10,796,659 |
| | 10,800,000 | 5,056,039 | 5,939,920 | | **$18,693,353** |

| Contract Year | | Purchases | Claimed Impacted Sales | Kindler Adjusted Reduced Profits per Unit | Kindler Adjusted Reduced Profitability |
|---|---|---|---|---|---|
| 3 (2018) | | 1,558,588 | 1,558,588 | $0.76 | $1,177,615 |
| **Adjusted AMP Breach Claim** | | | | | **$19,870,968** |

Identical to Donohue's Slide 12 with exception of but-for costs.

89. For the reasons set forth below, the Tribunal has determined the actual damages suffered by the Claimant as a result of the Respondent's breach of the Agreement is USD 17,477,511 as set forth on Donohue Slide 12.

90. The Tribunal will now take each year in turn.

91. As to Contract Year Three (2018), on July 17, 2019, the Parties entered into Amendment 2 to the Agreement whereby the Respondent agreed to purchase an amount at least equal to any original shortfall for Contract Year Three (R-138).

92. The Claimant agreed that if such purchases were in fact made in accordance with Amendment 2, it would not seek shortfall damages for Contract Year Three. In fact, it appears that the Respondent actually purchased an amount which exceeded any shortfall attributable that Contract Year (Respondent's Post Hearing Brief, p. 33).

93. Therefore, the Claimant is not entitled to any shortfall damages as to Contract Year Three.

94. However, the Tribunal has concluded that as a result of the Respondent's failure to make timely purchases in Contract Year Three, the Claimant suffered reduced profitability as a result of higher costs on units sold in 2018. (Kindler Reply Expert Report p.9). While this might be self-explanatory and obvious, nonetheless the Tribunal does note that if a business has a contractual right to have a certain number of items bought from it at a particular price during a particular year, and the counterparty does not then follow through with that purchase, such business's profitability is more than likely to suffer. That is a natural inference to be drawn.

95. The Respondent does not seriously dispute the fact of this reduced profitability but does dispute the amount as more fully discussed below.

96. The principal point in dispute regarding the calculation of damages as to all three years relates to the proper but-for or fixed costs which should be used in determining actual lost profits for each year. The unit price to be sold as per the Agreement was USD 5.25. The Claimant asserts that the correct per unit but-for cost should be USD 1.85 resulting in a per unit lost profit of USD 3.40 based on some extrapolated cost data from Contract Year One (2016). The Respondent contends that the but-for cost number should be USD 2.19 which leads to a per unit loss of USD 3.06 based on actual costs incurred in 2017. The difference between the Parties, therefore, amounts to USD 0.34 per unit.

97. The Tribunal is persuaded that the 2017 cost data should be used because it was the last complete year where the Respondent fulfilled its Annual Minimum Purchase obligation and is the basis for the Contract Year Three Annual Minimum Purchase and beyond.

98. Thus, as to Contract Year Four (2019), the Tribunal has concluded the shortfall lost profits damages number is USD 7,107,213.00 as set forth on Donohue Slide #12 with a lost profit per unit of USD 3.06. This amount reflects the amount of purchases

actually (and, therefore, from an evidential point of view, the closest the Tribunal has in terms of apposite "real life" figures) made by the Respondent during that Contract Year together with certain deductions made in accordance with Schedule C of the Agreement which permits the Annual Minimum Purchase amount to be reduced by the amount of sales made by the Claimant to "direct customers" of the Respondent.

99. For the reasons set forth in the Respondent's Rebuttal Expert Report (see p. 24 and p. 34 of Respondent's Post Hearing Brief), the Tribunal finds that such deductions were properly made in accordance with Schedule C.

100. As to Contract Year Five (2020), again using a lost profit per unit of USD 3.06, the shortfall damages amount is USD 9,717,250 as set forth on Donohue Slide #12 with no further deductions as per Schedule C.

101. Also, as discussed above, there is an additional amount of reduced profitability damages for Contract Year 3 in the amount of USD 653,048.00 applying the 2017 but-for cost data to the 1,558,588 sales units affected.

102. In summary, this makes the total damages amount due to the Claimant from the Respondent USD 17,477,511.00 as discussed and analyzed above. The amount does not include any applicable interest which is discussed below. For completeness, the Tribunal recalls that the Claimant's claim was articulated as follows and the relevant findings are set beside:

> - *Contract Year Three: $8,168,888* [as per para. 101 above, USD 653,048.00 was awarded]
> - *Contract Year Four: $8,679,260* [as para. 98 above, USD 7,107,213.00 was awarded]
> - *Contract Year Five: $10,796,311* [as para. 100 above, USD 9,717250.00 was awarded]

Thus, the Claimant's lost profits expectancy claim of USD 27,644,459.00 has been reduced by USD 10,166,948 to USD 17,477,511.00.

103. Finally, the Tribunal denies the Respondent's further arguments for additional reductions either by way of mitigation or pursuant to the force majeure clause in the Agreement. The Respondent, as discussed in detail above, was plainly required to make certain minimum purchases under the Agreement. Hence, the Claimant was under no obligation to mitigate with regard to those purchases in light of the Respondent's breach of that obligation. If the Claimant was, for the purposes of argument, able to sell additional product to third parties that, in and of itself, does not diminish its loss of sales to the Respondent. As to the force majeure argument, the Tribunal does not believe it applies under the circumstances here where it was fully understood by the Parties that beginning in Contract Year Three there would be direct competition regarding the sale of these products. Such marketplace activities are not subject of the clause that the Respondent seeks to invoke.

*Claims regarding the Claimant's Proprietary Information and Marks*

104. The Tribunal now turns to the Claimant's claim that the Respondent breached the Agreement by misusing the former's trademarks, and its request for related damages including treble, punitive and statutory damages.  This claim is denied for the reasons set forth in this section of the award.

105. Having fully considered all the evidence and submissions of the parties, the Tribunal finds the Claimant has failed to prove this claim, both as a matter of liability and of quantum. In the latter regard, this is of importance for the Tribunal as the Claimant has not proven that it lost any sales, so even if, for the sake of argument, it could demonstrate some predicate liability (which it has not) there would still be the insurmountable obstacle of no proven loss.

106. The Claimant argues that it notified Respondent by a letter dated January 16, 2019, of specific infringements and "immediately cease misuse of Trividia's trademarks" (C-065).  It argues that this letter put the Respondent on notice to cease all infringing

activity, and not just specifically identified infringing activity.  It further contends that even if the Respondent ceased the specifically identified infringing activity within a 30 day cure period, the Respondent continued to infringe upon the marks such as through "upgrade advertisement," on its website. However, the Claimant's only evidence of this "advertisement" is a screenshot from the Respondent's website from February 28, 2019 (C-087). The Claimant also argues that the Respondent failed to take action to correct the information that was provided to consumers in "thousands of copies of the [infringing] flyers [which] were distributed" (Claimant's post hearing brief para. 84).

107. The Respondent argues that upon receiving notice (C-065), it stopped the enumerated activities by removing the Nipro Australia webpage and ceasing dissemination of the complained-of letter and flyer.  The Respondent argues that other infringements that continued after the 30-day cure period were not specifically raised in the notice of infringement that the Claimant sent.  In particular, the Respondent's TRUECare website was not specifically complained of in the Claimant's notice of infringement (Respondent's reply post hearing brief para 27).

108. The Tribunal does not need, in its analysis, to reach the question of whether the Respondent's various actions infringed upon the Claimant's marks, because even if there was an infringement, the Respondent cured the infringements identified in the notice of infringement.  The Respondent removed the Nipro Australia FAQ webpage, and ceased dissemination of the complained-of letter and flyer.  There is insufficient evidence of any uncured breaches after the 30-day cure period.  The Tribunal finds that the single screenshot of Respondent's website on February 28, 2019 is inconclusive evidence of infringement after the cure period.  If that website had been a real business and legal concern of the Claimant and there was indeed an ongoing infringement, it would have been reasonable to expect the record to reflect further written complaints by the Claimant to the Respondent about that infringement.  The evidentiary record lacks such further proof.  The Tribunal concludes that Claimant has not met its burden of proof of any ongoing infringements past the cure period in 2019.

109. Having concluded that the Claimant has not proven its infringement claim on the merits, the relief its requests in the form of adverse inferences, damages, injunctive relief is consequently denied.

110. As already mentioned above, the Tribunal also, in its consideration of the Claimant's quantification and proof of the damages associated with the infringement claim, come to the conclusion that no such damage has been established. Thus, even if the Claimant had established some element of liability on the part of the Respondent in that regard, no proven damage has been established. The Tribunal has particularly considered, and been persuaded by the contents of the Donohue Rebuttal Report (paras. 11-12 in particular) that the Claimant's "expectancy damages" claim in connection with the Annual Minimum Purchase obligation overlaps with the "infringement claim" damages. The Claimant cannot obtain the same damages twice.

111. For completeness, and in light of all of the foregoing, the Tribunal considers no other issue arises to be addressed which might have fallen into the sweep-up category of issues noted at para. 25(e) above.

## F.    Interest

112. The Claimant seeks pre-judgment interest at the New York state law rate of 9%. In that respect, at para. 101 of its post-hearing brief the Respondent says that under New York law an arbitrator is considered "at least as unrestrained as a chancellor in equity" with broad discretion and flexibility to determine whether or not pre-judgment interest is appropriate and fashion such an award for each particular case. Further, at para. 103 of the same document the Respondent says that New York common law provides the Tribunal with discretion to award pre-judgment interest at a rate it sees fit to compensate a contracting party for losses it suffered as a result of a breach, but such an

award is not mandatory and may not be punitive. The Claimant disputes these points and relies on the New York CPLR (Ex. CLAs 516 & 525) 5001 and 5004 in particular.

113. The Tribunal does not agree with the Claimant that the sections of the CPLR concerning interest in court proceedings applies to this arbitration. Section 101 of the CPLR explicitly states that the entire CPLR applies to New York <u>courts</u>. It does not mention arbitral tribunals at all. Furthermore, the CPLR does contain an entire chapter on arbitration, Chapter 75.

114. Nothing in Chapter 75 applies the New York court rate of interest to arbitration. Indeed, its Chapter 75 on arbitration does not fix any rate of interest at all for arbitration proceedings seated in New York. Accordingly, the Tribunal concludes that it is free to fix any rate of interest. Taking into account the circumstances of the dispute, the Tribunal decides to only award any pre-judgment interest to the Claimant, at the simple interest rate of PRIME plus 2% from the date of termination of the Agreement (March 8, 2019) to the date of this Final Award.

## G.    Costs

115. On March 3, 2020, the Claimant quantified its claims for costs as follows: (a) USD 3,082,276.52 in attorneys' fees; and (b) USD 1,018,746.61 in costs and outlay (including payment of advances to the ICC totaling USD 377,500.00).

116. On March 3, 2020, the Respondent quantified its claims for costs as follows: (a) USD 10,163,018.70 in attorneys' fees; (b) USD 561,998.01 in expert fees and expenses; and (c) USD 576,079.88 in direct expenses (including payment of advances to the ICC totaling USD 377,500.00).

117. The Tribunal notes Article 38 of the ICC Rules which provides as follows, in part:

> *(1) The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court,*

> *in accordance with the scale in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.*
>
> *. . .*
>
> *(4) The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*
>
> *(5) In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner.*

118. As a matter of Article 38(5), which permits the Tribunal to "take into account such circumstances as it considers relevant," there is usually a broad discretion in the exercise of the authority to award costs. However, there is a relevant factor, namely, Article 14 of the Agreement which interposes a particular outcome in respect of legal fees and contractual disputes:

> *If any legal action, arbitration, proceeding, hearing, or motion is brought by any party to this Agreement to enforce the terms and conditions of this Agreement, whichever party shall prevail shall be entitled to an award of reasonable attorney's fees, paralegal fees, costs and expenses.*

119. In general, the Claimant is the prevailing party on the following main points: (a) the interpretation of the Agreement (as reflected in the Partial Final Award); (b) the fact that the overarching position taken by the Respondent after the First Award that the Agreement had to be changed; (c) termination of the Agreement; and (d) the "expectancy damages". These points occupied a significant part of the work on this case, and indeed when the Respondent sought to introduce its reformation claims after the Partial Final Award, the Tribunal has noted that the case became greatly more complex than its initial foundations.

120. Placed against the foregoing is the fact that the Respondent is the prevailing party on the Claimant's proprietary marks claim. This claim was of significant scale in terms of quantum and factual analysis.

121. Overall, placing the relative successes and failure against one another, the Claimant does emerge in the "net" position of being the prevailing party. Thus, as a matter of Article 14 of the Agreement this engages an entitled to reasonable legal fees. That element of reasonableness must be linked to the relative extent of the Claimant's success.

122. The Tribunal records that the Parties' Counsel have epitomised high standards of professionalism, diligence, courtesy and efficiency from its first meeting right through to the end of the arbitration. The Tribunal has been assisted, promptly, throughout the conduct of the arbitration by Counsel.

123. Taking all of the foregoing into account, the Tribunal has come to the conclusion that roughly 2/3s of the claimed fees and expenses represents an appropriate reflection of the Claimant being the prevailing party. The Tribunal has rounded out a total figure for such reasonable legal fees and expenses to USD 2,400,000.00. The relative successes and failures before the Tribunal are fairly reflected in this outcome and which is consistent with Article 14 of the Agreement.

124. When considering the separate question as to who will bear the burden of the costs of the arbitration as meant by Article 38(4) of the ICC Rules. The Parties have each contributed equally to the advances on costs made to the ICC and therefore the question now arises as to whether any adjustment (in substance) should be made to that overall position.

125. At its session of September 16, 2020, the ICC Court fixed the arbitrators' fees (USD 597,000.00) and the ICC administrative expenses (USD 100,277.00) which, together

with the Tribunal expenses (USD 27,223.00), amount to USD USD 724,500.00, said amount having been paid[7] by the Parties in equal shares.

126. In exercise of its power under Article 38(4) of the ICC Rules, bearing in mind the respective outcome of the arbitration (noting the quantum claimed, and the quantum ultimately awarded), the Tribunal holds that the Respondent is to pay to the Claimant the amount of USD 50,000.00.

## H.    General

127. The Tribunal records that it has taken note of, and considered, all submissions and evidence put before it. It has referred in this Final Award to those parts of the submissions and evidence it has considered necessary for the explanation of its reasoning; however, all submissions and evidence were taken account of, whether expressly referred to or not, in the formulation and articulation of the reasons and conclusions in this Final Award.

---

[7] The Parties each paid USD 377,500.00. The Parties are being each reimbursed USD 15,250.00 arising from both unutilized expense amounts and deductions pursuant to Section VIII of the Note to the Parties and Arbitral Tribunals on the Conduct of the Arbitration under the ICC Rules of Arbitration.

**EXHIBIT A**

I.    **Final Award**


**<u>For the reasons stated, the unanimous final award of the Tribunal is as follows:</u>**


A.    The Respondent breached the Agreement by failing to make the Annual Minimum Purchase for Contract Year Three thereby resulting in termination of the Agreement and the entitlement of the Claimant to damages (the latter being ordered at B just below).


B.    The Respondent is ordered to pay the Claimant USD 17,477,511.00 by way of damages together with interest at the PRIME rate plus 2% per annum from March 8, 2019 to the date of this Final Award.


C.    The Respondent is ordered to pay the Claimant USD 2,400,000.00 by way of legal costs and USD 50,000.00 by way of arbitration costs.


D.    All other prayers for relief made by the Parties as against each other as recorded above are hereby denied.


**Seat of Arbitration: New York, New York, U.S.A.**

**Date: September 18, 2020**


Mr. James W. Quinn (Co-arbitrator)                    **Dr. Tai-Heng Cheng (Co-arbitrator)**

**Mr. Klaus Reichert (President)**